CITY OF LIMA, Appellant,

v.

The STATE of Ohio, Appellee.

[Cite as *Lima v. State,* 177 Ohio App.3d 744, 2007-Ohio-6419.]

Court of Appeals of Ohio,
Third District, Allen County.

No. 1–07–21.

Decided Dec. 3, 2007.

746

Anthony L. Geiger, City Law Director, for appellant.

Frank M. Strigari, Assistant Attorney General, for appellee.

PRESTON, Judge.

## I. Factual Background

{¶ 1} Plaintiff-appellant, the city of Lima, appeals the Allen County Court of Common Pleas grant of summary judgment in favor of defendant-appellee, the state of Ohio.[1] Since the trial court erred in finding that R.C. 9.481 was validly enacted pursuant to Section 34, Article II of the Ohio Constitution and meets the test of *Canton v. State*, 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, we reverse and remand for further proceedings not inconsistent with this opinion.

{¶ 2} On November 2, 1920, Lima voters adopted a city charter pursuant to Section 3, Article XVIII of the Ohio Constitution. In 1974, section 72 of the Lima City Charter was amended to permit Lima City Council to determine by ordinance whether to establish a residency requirement for city employees.

{¶ 3} On October 23, 2000, Lima City Council passed Ordinance 201–00 pursuant to section 72 of the Lima City Charter, which "established a requirement for persons appointed by the Mayor as employees of the city on or after the date of passage of this ordinance, that as a condition of employment with the city all such employees shall live in a primary permanent residency within the corporate boundaries of the municipality."

---

1. Amicus curiae, Local 334 of the International Association of Fire Fighters, has also submitted a brief in support of the state of Ohio in this case.

{¶ 4} On May 1, 2006, the General Assembly enacted R.C. 9.481 pursuant to Section 34, Article II of the Ohio Constitution (hereinafter "Section 34"), which, except in specified circumstances, limited the ability of political subdivisions throughout Ohio to condition employment upon residency.

{¶ 5} On May 22, 2006, Lima filed an action for declaratory judgment and injunctive relief in the Allen County Court of Common Pleas against the state arguing that R.C. 9.481 is unconstitutional on several grounds. Cross-motions for summary judgment were filed on December 15, 2006, with both parties responding on January 12, 2007.

{¶ 6} On February 16, 2007, the trial court granted the state's motion for summary judgment upholding the constitutionality of R.C. 9.481 and denied Lima's motion for summary judgment. On April 19, 2007, Lima appealed the trial court's grant of summary judgment to this court, asserting three assignments of error.

## II. Standard of Review

{¶ 7} We review a grant of summary judgment de novo. *Sharonville v. Am. Employers Ins. Co.,* 109 Ohio St.3d 186, 2006-Ohio-2180, 846 N.E.2d 833, ¶ 5, citing *Comer v. Risko,* 106 Ohio St.3d 185, 2005-Ohio-4559, 833 N.E.2d 712, ¶ 8. Summary judgment is appropriate when "(1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion when viewing the evidence in favor of the nonmoving party, and that conclusion is adverse to the nonmoving party." *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241, citing *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.* (1994), 69 Ohio St.3d 217, 219, 631 N.E.2d 150; Civ.R. 56(C).

{¶ 8} Whether a statute is constitutional is a question of law reviewed de novo. *Wilson v. AC&S, Inc.,* 169 Ohio App.3d 720, 2006-Ohio-6704, 864 N.E.2d 682, ¶ 61; *Akron v. Callaway,* 162 Ohio App.3d 781, 2005-Ohio-4095, 835 N.E.2d 736, ¶ 23. De novo review is independent and without deference to the trial courts determination. *Wilson,* 169 Ohio App.3d 720, 2006-Ohio-6704, 864 N.E.2d 682, at ¶ 61. "[A]ll statutes are presumed constitutional, and the party challenging [has] the burden of proving otherwise" beyond a reasonable doubt. *State v. Boczar,* 113 Ohio St.3d 148, 2007-Ohio-1251, 863 N.E.2d 155, ¶ 9, citing *Arnold v. Cleveland* (1993), 67 Ohio St.3d 35, 38–39, 616 N.E.2d 163; *State ex rel. Jackman v. Cuyahoga Cty. Court of Common Pleas* (1967), 9 Ohio St.2d 159, 38 O.O.2d 404, 224 N.E.2d 906, 908–909 ( "[W]hen an enactment of the General Assembly is challenged, the challenger must overcome a strong presumption of constitutionality"). All presumptions and applicable rules of statutory construction are applied to uphold a statute from constitutional attack. *State v. Dorso* (1983), 4 Ohio St.3d

60, 61, 4 OBR 150, 446 N.E.2d 449; *State v. Stambaugh* (1987), 34 Ohio St.3d 34, 35, 517 N.E.2d 526.

{¶ 9} "[I]t is not the function of a reviewing court to assess the wisdom or policy of a statute but, rather, to determine whether the General Assembly acted within its legislative power." *Austintown Twp. Bd. of Trustees v. Tracy* (1996), 76 Ohio St.3d 353, 356, 667 N.E.2d 1174, citing *State ex rel. Bishop v. Mt. Orab Village Bd. of Edn.* (1942), 139 Ohio St. 427, 438, 22 O.O. 494, 40 N.E.2d 913; *Primes v. Tyler* (1975), 43 Ohio St.2d 195, 72 O.O.2d 112, 331 N.E.2d 723.

{¶ 10} "The courts must declare the sense of the law; and if they should be disposed to exercise will instead of judgment, the consequence would equally be the substitution of their pleasure to that of the legislative body." The Federalist No. 78 (Alexander Hamilton) (Clinton Rossiter Ed.1961) 468–469. "The principle that courts are not the creators of public policy and should not decide cases based on disagreement with a legislature has guided courts since the creation of the American judicial system." *Holeton v. Crouse Cartage Co.* (1992), 92 Ohio St.3d 115, 135, 748 N.E.2d 1111 (Moyer, C.J., dissenting).

## III. Trial Court's Ruling

{¶ 11} Although we review constitutional questions de novo, for clarification purposes and an otherwise thorough review we set forth the essential findings of the trial court.

{¶ 12} This appeal follows the Allen County Court of Common Pleas grant of summary judgment in favor of the state of Ohio. The trial court set forth the following issue for its review:

[W]hether * * * O.R.C. 9.481 as enacted by the General Assembly which provides employees of Ohio's political subdivisions with freedom to choose where they want to live, is unconstitutional because it conflicts with Section 3, Article XVIII of the Ohio Constitution * * *

*Lima v. Ohio* (Feb. 15, 2007), Allen C.P. No. CV2006–0518, at 4. The trial court first considered the relevance of the *Canton* test and a traditional home-rule analysis. Id. at 6. The trial court concluded that laws validly passed pursuant to Section 34, Article II of the Ohio Constitution cannot be impaired by the Home Rule Amendment; and therefore, a traditional home-rule analysis was unnecessary. Id. at 10, citing *Rocky River v. State Emp. Relations Bd.* (1989), 43 Ohio St.3d 1, 539 N.E.2d 103.

{¶ 13} The trial court then concluded that R.C. 9.481 was validly enacted pursuant to Section 34. The trial court decided that Lima's residency requirement is a condition of employment. Id. at 11, citing *St. Bernard v. State Emp. Relations Bd.* (1991), 74 Ohio App.3d 3, 6, 598 N.E.2d 15. As a condition of

employment, the trial court reasoned, R.C. 9.481's regulation of residency requirements concerned the general welfare of public employees; and therefore, the law was validly enacted pursuant to Section 34. Id.

{¶ 14} After it concluded that R.C. 9.481 was validly enacted pursuant to Section 34 and superseded the Home Rule Amendment, the trial court examined R.C. 9.481 under the traditional *Canton* home-rule analysis in the alternative.

{¶ 15} Prior to conducting a *Canton* analysis, the trial court found that residency requirements are an issue of statewide concern due to the extraterritorial effects that such requirements have on other Ohio communities. Id. at 12. The court then concluded that since residency requirements are a matter of statewide concern, the state's power to regulate superseded the municipality's right to home rule. Id. at 12–13, citing *Cleveland Elec. Illum. Co. v. Painesville* (1968), 15 Ohio St.2d 125, 129, 44 O.O.2d 121, 239 N.E.2d 75; *Uniformed Firefighters Assn. v. New York* (1980), 50 N.Y.2d 85, 428 N.Y.S.2d 197, 405 N.E.2d 679.

{¶ 16} Finally, the trial court concluded that even if it applied the *Canton* test, the state of Ohio still prevailed. Id. at 13. Applying the four-part *Canton* test, the trial court reached the following conclusions:

1. Generally permitting employees of political subdivisions through [sic] the State of Ohio to live where they choose to live while providing political subdivisions with a process for enacting specific exceptions, constitutes a statewide and comprehensive legislative enactment in and of itself.

2. O.R.C. 9.481 operates uniformly throughout the State of Ohio because the statute applies across the State to all included within the statute's operative provisions.

3. Subject of providing employees of political subdivisions throughout the State of Ohio with the freedom to choose where they want to live is of a general nature for all of these employees. Specifically, the law's subject not only affects employees of the City of Lima by providing them with the freedom to choose where they want to live, but it also affects employees of every other political subdivision within the State of Ohio in the same manner.

4. O.R.C. 9.481 qualifies as an exercise of police power. State's police power embraces regulations designed to promote public convenience or the general prosperity or welfare, as well as those specifically intended to promote the public safety or public health. (Quoted from *Wessel[l] v. Timberlake* (1916), 95 Ohio St. 21, 34 [116 N.E. 43])

5. O.R.C. 9.481 proscribes a rule of conduct on citizens generally. As noted by the State, the statute applies to political subdivisions, but "the practical effect of the legislation and common sense tells us 'that O.R.C. 9.481 has a

direct impact on the conduct of employees of political subdivisions generally' " *City of Canton*, supra, at 155, 766 N.E.2d 963.

For these reasons, the trial court concluded that R.C. 9.481 was constitutional under both *Canton* and the doctrine of statewide concern in addition to its earlier conclusion that R.C. 9.481 superseded Lima's ordinance under Section 34.

{¶ 17} Several other trial courts throughout the state have concluded that R.C. 9.481 is constitutional and supersedes municipal ordinances to the contrary for similar reasons. *Toledo v. State* (July 27, 2007), Lucas C.P. No. CI06–3235; *Dayton v. State* (June 6, 2007), Montgomery C.P. No. 06–3507; *Akron v. State* (Mar. 30, 2007), Summit C.P. No. CV 2006–05–2759; *Cleveland v. State* (Feb. 23, 2007), Cuyahoga C.P. No. 06–590463; *Am. Fedn. of State, Cty., & Mun. Emps. Local # 74 v. Warren* (Sept. 14, 2007), Trumbull C.P. No. 2006 CV 01489. The Ohio courts of appeals have not decided the constitutionality of R.C. 9.481.

## IV. Analysis

{¶ 18} Lima asserts three assignments of error for our review. Since assignment of error two must be resolved before assignment of error one becomes relevant, we will analyze it first. Our disposition of assignments of error one and two renders assignment of error three moot.

{¶ 19} In its first assignment of error, Lima argues that the trial court incorrectly determined that R.C. 9.481 is constitutional pursuant to the doctrine of statewide concern. Lima contends that the trial court did not apply the doctrine of statewide concern within the context of the *Canton* test. 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963. Under a proper formulation of the *Canton* test, argues Lima, R.C. 9.481 is not a "general law"; and therefore does not supersede Lima's home-rule authority.

{¶ 20} The state argues that the proper analysis for determining whether R.C. 9.481 is constitutional is not *Canton*'s home-rule analysis, but rather the analysis outlined in *Am. Assn. of Univ. Professors v. Cent. State Univ.* and *Rocky River IV.* (1999), 87 Ohio St.3d 55, 717 N.E.2d 286, 43 Ohio St.3d 1, 539 N.E.2d 103. The state claims that *Cent. State Univ.* and *Rocky River IV,* like this case and unlike *Canton*, involved laws enacted pursuant to Section 34, Article II of the Ohio Constitution.

{¶ 21} Lima agrees with the state that laws validly enacted pursuant to Section 34, Article II of the Ohio Constitution supersede local ordinances passed pursuant to Article XVIII, Section 3 of the Ohio Constitution, the home-rule authority. However, Lima alleges in its second assignment of error that R.C. 9.481 was not validly enacted pursuant to Section 34, Article II of the Ohio Constitution.

{¶ 22} Therefore, the first issue before this court is whether R.C. 9.481 was validly enacted pursuant to Article II, Section 34 of the Ohio Constitution. If the answer to this inquiry is "yes," the parties agree that R.C. 9.481 supersedes Lima Ordinance No. 201–00; if the answer is "no," then the *Canton* traditional home-rule analysis applies, and Lima's first assignment of error becomes relevant.

### Assignment of Error No. II

The trial court erred in concluding R.C. 9.481 was a valid enactment pursuant to Article II, Section 34 of the Ohio Constitution.

{¶ 23} In its second assignment of error, Lima argues that R.C. 9.481 was not validly enacted pursuant to Article II, Section 34, because "Section 34 * * * address[es] employment issues directly related to the working environment." The state counters that Section 34's general welfare clause applies to "conditions of employment," and since residency is one such condition, R.C. 9.481 is within Section 34's grant of authority.

{¶ 24} At oral argument, Lima asserted that "conditions of employment" and "conditions for employment" are distinct issues, because the former means conditions within the working environment, whereas the later means qualifications for employment. Lima concedes that Section 34's grant of authority covers working environment conditions, but disagrees that it extends to qualifications for employment. We agree with Lima that Section 34's language, legislative history, and case law support a more limited grant of legislative authority than the state presents.

### A. Section 34's Plain Language

{¶ 25} "Generally speaking, in construing the Constitution, we apply the same rules of construction that we apply in construing statutes." *State v. Jackson,* 102 Ohio St.3d 380, 2004-Ohio-3206, 811 N.E.2d 68, ¶ 14. " '[O]ur inquiry begins with the statutory text, and ends there as well if the text is unambiguous.' " *State ex rel. Plain Dealer Publishing Co. v. Cleveland,* 106 Ohio St.3d 70, 2005-Ohio-3807, 831 N.E.2d 987, ¶ 38, quoting *BedRoc Ltd., L.L.C. v. United States* (2004), 541 U.S. 176, 183, 124 S.Ct. 1587, 158 L.Ed.2d 338.

{¶ 26} Section 34, Article II of the Ohio Constitution provides:

Laws may be passed fixing and regulating the hours of labor, establishing a minimum wage, and providing for the comfort, health, safety and general welfare of all employees; and no other provision of the constitution shall impair or limit this power.

Section 34's plain text provides four clauses. The first three are grants of legislative authority; the fourth is a supremacy clause. First, Section 34 grants the General Assembly the authority to pass laws "fixing and regulating the hours

of labor" ("hours clause"). Second, Section 34 grants the General Assembly authority to pass laws "establishing a minimum wage" ("minimum-wage clause"). Third, Section 34 grants the General Assembly authority to pass laws "providing for the comfort, health, safety, and general welfare of all employes" ("general-welfare clause"). Fourth, Section 34 provides that "no other provision of the constitution shall impair or limit this power" ("supremacy clause").

{¶ 27} Lima argues that the general-welfare clause grants the General Assembly authority to pass laws addressing "employment issues directly related to the working environment." The general-welfare clause states laws may be passed "providing for the comfort, health, safety, and general welfare of employees." The general-welfare clause, thus, provides that the General Assembly may pass laws providing for the "general welfare." General welfare means "[t]he public's health, peace, morals, and safety." Black's Law Dictionary (8th Ed.2004) 1625; *Mirick v. Gims* (1908), 79 Ohio St. 174, 179, 86 N.E. 880. Usually, the term "general welfare" is associated with the state's police powers, which are broad and discretionary. *Gims,* 79 Ohio St. at 179, 86 N.E. 880.

{¶ 28} The general-welfare clause's language is, however, limited by subject matter. The general-welfare clause's plain language requires that the General Assembly enact laws providing for the general welfare "of all employes." Lima's assignment of error, thus, raises the issue of whether the term "employes" in Section 34 means employees acting within the scope of their employment (i.e. within the working environment) or whether "employes" refers to the status of being an employee, which transcends any particular locus. In other words, does the term "employes" refer to the status of being an employee 24 hours per day, which attaches at hiring and sheds at firing ("employee" in its broadest sense), or does the term have a more limited meaning, which is intricately tied to a particular locus; here, the work environment? If the later interpretation is correct, the plain language would support finding that laws passed pursuant to Section 34's general-welfare clause must address issues related to the employees' working environment as Lima argues. If the former interpretation is correct, then the plain language would support finding that laws passed pursuant to Section 34 *can* address issues beyond the employees' working environment as the state argues.

{¶ 29} The common law already recognizes the status-conduct distinction of an employee, for example, in tort law. The doctrine of respondeat superior[2] requires that an employer answer for torts committed by an employee. However, it is a settled tort law rule that an employer is only liable for the torts

---

2. "Respondeat superior" is defined as "The doctrine holding an employer or principal liable for the employee's or agent's wrongful acts committed within the scope of the employment or agency." Black's Law Dictionary (8th Ed.2004) 1338.

committed by an employee under the doctrine if the employee commits the tort while acting within the scope of his or her duties. See, e.g., *Byrd v. Faber* (1991), 57 Ohio St.3d 56, 58, 565 N.E.2d 584. Consequently, the law recognizes that one may be an employee in status, but not by conduct. Since other areas of law draw this distinction, the scope of the term "employees" in Section 34 should be considered.

{¶ 30} Since the meaning of the term "employes" is not defined within the text of the Section 34, we must interpret it consistent with common usage. R.C. 1.42; *State ex rel. Lee v. Karnes,* 103 Ohio St.3d 559, 2004-Ohio-5718, 817 N.E.2d 76, ¶ 23. Black's Law Dictionary defines "employee" as

[a] person who works in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of work performance.

(8th Ed.2004) 564. The American Heritage Dictionary defines "employee" as: "[a] person who works for another in return for financial or other compensation." (2nd College Ed.1985) 250. Neither definition provides a definitive conclusion regarding the scope of the term "employee." Both definitions refer to the status of being an employee, but Black's Law definition also emphasizes employer control over work performance, which generally applies when an employee is acting within the scope of his or her employment.

{¶ 31} Since the common definition of "employee" does not satisfactorily resolve its scope and, thus, the extent of the General Assembly's general welfare authority under Section 34, we must utilize other rules of statutory interpretation.

### B. Section 34 & Noscitur a Sociis

[6] {¶ 32} As the Ohio Supreme Court has noted, " 'the natural meaning of words is not always conclusive as to the construction of statutes.' " *Cleveland,* 106 Ohio St.3d 70, 2005-Ohio-3807, 831 N.E.2d 987, at ¶ 40. When the meaning of a word or phrase is unclear, the statutory doctrine of noscitur a sociis instructs a reviewing court to determine its meaning by the words immediately surrounding it. Black's Law Dictionary (8th Ed.2004) 1087. See also *Wilson v. Stark Cty. Dept. of Human Serv.* (1994), 70 Ohio St.3d 450, 453, 639 N.E.2d 105.

{¶ 33} The meaning of the Section 34's third clause, then, must be interpreted consistent with Section 34's first and second clauses, which, like the general-welfare clause, provide grants of legislative authority. We agree with Lima that if the general welfare clause's grant of authority is read consistent with the hours clause and the minimum wage clause, as the doctrine of noscitur a sociis instructs, then the general welfare clause grants the General Assembly authority to pass laws regulating work environment conditions.

{¶ 34} The general-welfare clause of Section 34 grants the General Assembly authority to pass laws "providing for the comfort, health, safety, and general welfare of all employes." As we noted above, Section 34's first clause grants the General Assembly the authority to pass laws "fixing and regulating the hours of labor," and Section 34's second clause grants the General Assembly authority to pass laws "establishing a minimum wage." The hours and minimum-wage clauses address working terms and conditions within the working environment context; they do not address qualifications for employment, nor do they address issues outside of the working environment. Therefore, noscitur a sociis instructs that the general-welfare clause should, likewise, be interpreted to address working environment conditions.

{¶ 35} Not only should we interpret the scope of the general-welfare clause in the same context as the hours and minimum-wage clauses, we should also interpret the term "general welfare" *within* the third clause in relation to the words directly preceding and following it. Common sense dictates that the words "comfort," "health," and "safety" relate to working environment conditions. Moreover, these terms, like "general welfare," are followed by the limiting term "employees." We, should therefore interpret "general welfare" to be a grant of legislative authority for laws affecting the employees' work environment conditions.

{¶ 36} Thus, the doctrine of noscitur a sociis applied to the general-welfare clause as a whole and to its components supports Lima's argument that the clause grants legislative authority for the purpose of passing laws that affect the employees' working environment.

## C. Section 34 Legislative History[3]

▆▆▆ {¶ 37} "If the meaning of a provision cannot be ascertained by its plain language, a court may look to the purpose of the provision to determine its meaning." *Jackson*, 102 Ohio St.3d 380, 2004-Ohio-3206, 811 N.E.2d 68, at ¶ 14, citing *Castleberry v. Evatt* (1946), 147 Ohio St. 30, 33 O.O. 197, 67 N.E.2d 861, paragraph one of the syllabus. "In determining legislative intent when faced with an ambiguous statute, the court may consider several factors [such as] circumstances under which the statute was enacted, the [objective of the statute], and the consequences of a particular construction." *Bailey v. Republic Engineered Steels, Inc.* (2001), 91 Ohio St.3d 38, 40, 741 N.E.2d 121, citing R.C. 1.49; *State v. Jordan* (2000), 89 Ohio St.3d 488, 492, 733 N.E.2d 601. Since we have determined that the term "employees" is ambiguous, and we cannot ascertain the

---

3. Much of the information herein was explained by the court in *Rocky River*; however, a fresh look at the legislative history is prudent.

scope of authority granted under Section 34's general-welfare clause by looking at its plain language, we turn to the legislative history for guidance.

### 1. Historical Circumstances

{¶ 38} The early 1900s were difficult times for American factory workers. The working environment often included long hours, low wages, and dangerous working conditions. Murlo, Priscilla A.B. Chitty, From the Folks Who Brought You the Weekend (New Press 2001) 145. See also, generally, Derks, Scott, Working Americans 1880–1999, Volume 1: The working Class (Grey House Pub.2000). Legislative efforts to remedy these woes were stifled by both state and federal courts striking down laws for violating the freedom to contract, which courts found as a substantive due process right. *Rocky River*, 43 Ohio St.3d at 26, 539 N.E.2d 103, fn. 31–32 (Wright, J., dissenting). One of the most infamous of this line of cases was *Lochner v. New York*, wherein the U.S. Supreme Court struck down a New York law setting a sixty-hour-per-week maximum for work in bakeries. (1905), 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937.

{¶ 39} The Ohio Constitutional delegates were aware of both factory working conditions and the legal climate when Section 34 was passed. Several delegates recognized the working conditions at factories. Mr. Farrell commented at length about the intolerable working conditions in American factories when debating Section 34's minimum-wage language:

> But, gentleman of the Convention, I have been compelled to change my position on th[e] question [of minimum wage] in the last few years. When one considers the relentless war that has been waged against the trade union movement in this country, and the war of extermination that is now going on, and, in some instances, meeting with success, in putting some unions out of business, and the general application of "black list," all for no other reason than the piling up of capitalistic profits without any regard for justice in the premises, when we see the attempts making to build up industries on the foundations of *wages too low to admit of decent standards of family life, and hours of labor too long to admit of sufficient rest and relaxation for even moderate health, we are driven to the knowledge that it is time that a decent humane effort should be made to remedy this un-American condition.*

(Emphasis added). 2 Proceedings and Debates of the Constitutional Convention of the State of Ohio (1912) 1328.

{¶ 40} The delegates were also aware of the courts' hostile attitude toward progressive labor reform. Mr. Lampson asked Section 34's reporting committee, "Did you investigate the question as to whether that provision in the constitution relating to the passage of laws violating the obligation of contract has any bearing on this proposal?" Id. at 1335. In response, Mr. Dwyer answered:

> The courts have been deciding cases. Take that bake-shop case in New York [i.e. *Lochner* ]. The supreme court there decided it was a question of private contract about the hours of labor. Our courts are becoming more progressive. They are catching the spirit of the time and we should put a clause in the constitution that will give the courts an opportunity to more liberally construe these matters than they have done in the past.

Id. Thus, it is evident from Section 34's debates that the constitutional delegates were well aware of both the working conditions in American factories and the legal climate with respect to labor reform.

### 2. Section 34's Objective

{¶ 41} On January 24, 1912, what is now Section 34 was introduced to the Ohio Constitutional Convention by Mr. Farrell, a delegate from Cuyahoga County, as Proposal No. 122, entitled "Relative to employment of women, children and persons engaged in hazardous employment." 1 Proceedings and Debates of the Constitutional Convention of the State of Ohio (1912) 106. On January 25, 1912, Proposal No. 122 was sent to the committee on labor. Id. at 118. On March 19, 1912, Proposal No. 122 was reported to the convention with an amendment to insert

> Laws may be passed fixing and regulating the hours of labor, establishing a minimum wage and providing for the comfort, health, safety and general welfare of all employes; and no other provision of the constitution shall impair or limit this power.

Id. at 755. The report was agreed to and the language amended. Id.

{¶ 42} On April 22, 1912, Proposal No. 122 was brought before the convention and read a second time, whereupon some debate was heard. 2 Proceedings and Debates, supra, at 1328. Mr. Farrell began his remarks noting:

> Since this proposal has been on the calendar I have heard some little objection to it, *especially with reference to* the clause which would permit the legislature to pass minimum wage legislation, and to that clause I intend to direct my remarks exclusively.

(Emphasis added). Id. On the other hand, Mr. Crites began his remarks noting that: "[f]irst, you will note that this proposal is for the *sole purpose* of limiting the number of hours of labor; second, to establish a minimum wage for the wageworker." Id. at 1331. (Emphasis added). During his remarks in support of the proposal, Mr. Dwyer commented that employers ought to

> give your employees fair living wages, good sanitary surroundings *during hours of labor*, protection as far as possible against danger, a fair working day. Make his life as pleasant for him as you can consistent with his employment.

(Emphasis added). Id. at 1332. Mr. Elson commented, "It seems to me that the kernel of this proposal is a minimum wage." Id. at 1336. On the other hand, Mr. Harris offered his support for Proposal No. 122, except the minimum-wage language:

> I am very anxious to support the remainder of the proposal, and if the authors will strike the words "minimum wage," the proposal will receive not only the united support of this Convention but of the people of Ohio.

Id. at 1337. Following this debate, the question was called and the proposal passed for the first time with eighty yeas and thirteen nays. Id. at 1338.

{¶ 43} On May 22, 1912, Proposal No. 122 was reported from the committee on Arrangement and Phraseology with an amendment to "[s]trike out the title and insert: 'To submit an amendment by adding section 34, Article II of the constitution.—Welfare of employes'" and make other grammatical corrections. Id. at 1742.

{¶ 44} On May 23, 1912, Proposal No. 122 was read for the third time whereupon Mr. Harris offered an amendment to strike the words "minimum wage." Id. at 1784. Debate on the amendment proceeded, but, ultimately, the amendment was tabled and the proposal passed for the second time with 96 yeas and five nays. Id. at 1786. Proposal No. 122's language at that time read the same as Section 34 now reads. Id.

{¶ 45} On May 31, 1912, Proposal No. 122 was reported from the committee on Arrangement and Phraseology without amendment and passed a third and final time [4] with 87 yeas and eight nays. Id. at 1955.

■ {¶ 46} Reviewing the constitutional debates in light of the historical context preceding Proposal No. 122 (now Section 34), it is obvious that its purpose was to empower the General Assembly with legislative authority over (1) the hours of labor, (2) a minimum wage, and (3) working environment. Although the debates surrounding Proposal No. 122 focused on its minimum wage provision, it is clear from our own review of the debates that the minimum wage provision was not Section 34's only subject. See also Rocky River, 43 Ohio St.3d at 14–16, 539 N.E.2d 103. Mr. Dwyer and Mr. Harris's remarks demonstrate that Proposal No. 122's supporting delegates were also concerned with working environment conditions within Ohio.

{¶ 47} R.C. 9.481 does not fall within Section 34's original intent as evidenced by the historical context and the Convention proceedings. Rather, R.C. 9.481

---

4. Proposal No. 122 was passed three times, twice for committee report changes/amendments and one final time with all the amendments incorporated.

attempts to regulate aspects of employment having nothing to do with the working environment—namely, where an employee resides after leaving work.

### 3. Interpretative Consequences

{¶ 48} We must also consider the affect of interpreting Section 34's general-welfare clause beyond the working environment. *Bailey,* 91 Ohio St.3d at 40, 741 N.E.2d 121, citing R.C. 1.49; *Jordan,* 89 Ohio St.3d at 492, 733 N.E.2d 601. If the general-welfare clause extends to issues outside the working environment, then what topic affecting employees would ever exceed its scope?

{¶ 49} Consider, for example, a law that would require employers to provide paid transportation to and from the workplace. Although the law does not concern the hours of labor or a minimum wage, it certainly affects the "general welfare" of employees. With soaring gas prices, congested traffic, and never-ceasing road construction, such a law would bring peace of mind to many employees across the state. If we agree with the state's interpretation of the general-welfare clause (i.e., beyond the working environment) this proposed law must also prevail. Like R.C. 9.481, the law would affect employees if we simply mean employees in status, as discussed above in Section IV A, but it would not affect employees within the scope of their employment. We simply cannot agree that Proposal No. 122's supporting delegates intended its language to extend beyond the working environment.

### D. Section 34 Case Law

{¶ 50} The state argues that case law supports a broad interpretation of the General Assembly's authority under Section 34. The state further argues that the cases relied upon by Lima for its argument that Section 34's general-welfare clause is limited to issues directly related to the working environment expressly contradict this narrow interpretation. We agree, in part, and disagree, in part, with the state's interpretation of Section 34 general-welfare case law.

{¶ 51} We agree with the state that Section 34 is a broad grant of legislative authority. *Am. Assn. of Univ. Professors v. Cent. State Univ.* (1999), 87 Ohio St.3d 55, 61, 717 N.E.2d 286 ("This court has repeatedly interpreted Section 34, Article II as a broad *grant* of authority to the General Assembly, not as a limitation on its power to enact legislation"); *Rocky River,* 43 Ohio St.3d at 13, 539 N.E.2d 103 (Section 34 "constitutes a broad grant of authority to the legislature to provide for the welfare of all working persons, including local safety forces," citing *State ex rel. Bd. of Trustees of Police Firemen's Pension Fund v. Bd. of Trustees of Police Relief & Pension Fund of Martins Ferry* (1967), 12 Ohio St.2d 105, 41 O.O.2d 410, 233 N.E.2d 135). However, the fact that the legislative grant of power is broad does not mean that the power exceeds the

amendment's language or original intent; therefore, a further analysis is required.

{¶ 52} An example of an appropriate analysis is found in *Cent. State,* supra. In that case, the American Association of University Professors ("AAUP") challenged R.C. 3345.45, which required a mandatory ten percent increase in faculty classroom instruction at state universities. 87 Ohio St.3d at 56, 717 N.E.2d 286. In addition to its equal-protection claims, AAUP argued that R.C. 3345.45 was outside the General Assembly's authority under Section 34. Id. at 60, 717 N.E.2d 286. AAUP argued that only laws *benefiting* employees could be passed pursuant to Section 34, and since R.C. 3345.45 *burdened* employees by increasing work hours, it was invalid. Id. The Ohio Supreme Court disagreed.

{¶ 53} The Ohio Supreme Court first noted that Section 34 powers are broad, as pointed out by the state. Id. at 61, 717 N.E.2d 286. However, the analysis did not stop there; instead, the court then went back to Section 34's plain language and reasoned that, in effect, AAUP was adding limiting language that did not exist in Section 34:

> AAUP's position would require Section 34 to be read as a limitation, in effect stating: "No law shall be passed on the subject of employee working conditions *unless it furthers* the comfort, health, safety and general welfare of all employees."

Id. Beyond the plain language analysis, the court also examined the practical effect of AAUP's interpretation and found that it was problematic in the context of many existing laws other than R.C. 3345.45. Id. Therefore, the state's emphasis on the Ohio Supreme Court's interpretation of Section 34 powers as "broad," although relevant, is not dispositive to the issue raised in this case; a further analysis is required.

{¶ 54} To begin with, we disagree with the state that *Pension Fund* or *Rocky River* "expressly contradict" Lima's argument that Section 34's general-welfare clause is limited to the working environment. On the contrary, these cases, read in their totality with an understanding of the laws at issue therein, lend support to Lima's argument that Section 34's general-welfare clause is more limited in scope than the state alleges. Furthermore, consistent with the amendment's primary concern, Section 34 general-welfare case law is limited to employee economic welfare.

{¶ 55} In *Pension Fund,* the municipality challenged several sections of R.C. Chapter 742 and specifically R.C. 742.26, which required that municipalities transfer their firefighter and police pension and relief fund assets into a state-controlled disability and pension fund. 12 Ohio St.2d at 106, 41 O.O.2d 410, 233 N.E.2d 135. The Ohio Supreme Court upheld R.C. 742.26 apparently under Section 34's general-welfare clause.

{¶ 56} The state of Ohio argues that pensions and disability benefits, the subject of *Pension Fund*, are not directly related to the work environment; and therefore, the General Assembly's Section 34 general-welfare authority extends beyond the work environment. The state reasons that pensions are received after retirement; and therefore, R.C. Chapter 742 is not related to the employee's working environment. Although pensions are received after retirement and, therefore, the effects of R.C Chapter 742 are realized after the employee is no longer in the working environment, R.C. Chapter 742 pension and disability benefits are calculated based on an employee's wages and years of service. R.C. 742.3716 and 742.39; Ohio Adm.Code 742–3–02. Consequently, R.C. Chapter 742 pension and disability benefits, upheld by the Ohio Supreme Court, are related to the working environment, since they are calculated with respect to time and wages earned in the workplace.

{¶ 57} Furthermore, pensions and disability benefits are nothing more than additional wages and compensation. Section 34's minimum-wage clause was enacted to give the state the authority to establish a wage foundation, but certainly the state is free to go beyond that foundation. The state, as employer, is also able to contract with its employees regarding wages and compensation, and does so regularly. Nothing in Section 34 was meant to limit this preexisting state power.

{¶ 58} In *Rocky River v. State Emp. Relations Bd.*, the Ohio Supreme Court determined that the Public Employees' Collective Bargaining Act, R.C. Chapter 4117, which provided for binding arbitration, addressed the "general welfare" of employees; and therefore, was a valid exercise of the General Assembly's Section 34 powers. 43 Ohio St.3d 1, 13, 539 N.E.2d 103. Like *Pension Fund*, R.C. Chapter 4117's legislative end was related to the work environment and the worker as an "employee" working within the scope of his or her duties. The purpose of a collective bargaining agreement is to provide for agreed-upon wages, hours, benefits, and other terms and conditions of employment, and the binding arbitration provided by R.C. Chapter 4117 was enacted to reach such an agreement. R.C. 4117.10. Wages, hours, benefits, and other terms and conditions of employment impact the worker in the work place.

{¶ 59} Contrary to the state's arguments, both *Pension Fund* and *Rocky River* do suggest that laws enacted pursuant to Section 34's general-welfare language must have, at minimum, *some* nexus between their legislative end and the working environment. R.C. 9.481, unlike the laws in *Pension Fund* and *Rocky River*, lacks any nexus between its legislative end and the working environment. Rather, R.C. 9.481 attempts to regulate where an employee may reside *outside* of the work place.

{¶ 60} More important, like *Rocky River* and *Pension Fund*, other cases interpreting Section 34's general-welfare language are limited to legislation providing for the economic welfare of employees. See, e.g., *State ex rel. Mun. Const. Equip. Operator's Labor Council v. Cleveland*, 114 Ohio St.3d 183, 2007-Ohio-3831, 870 N.E.2d 1174 (sick-leave benefits); *State ex rel. Horvath v. State Teachers Retirement Bd.* (1998), 83 Ohio St.3d 67, 697 N.E.2d 644 (teacher's savings plans); *Cincinnati v. Ohio Council 8, Am. Fedn. of State, Cty., & Mun. Emp.* (1991), 61 Ohio St.3d 658, 576 N.E.2d 745 (collective bargaining). In fact, Justice Cook has noted that "[e]conomic legislation related to the welfare of employees, including pension funds for public employees, is granted favored status under Section 34, Article II of the Ohio Constitution." *Horvath*, 83 Ohio St.3d at 74, 697 N.E.2d 644, fn. 2. One of the main purposes behind Section 34 was to address the economic welfare of employees who were earning meager wages during the 1900's. Consistent with Section 34's genesis, the Ohio Supreme Court has limited the scope of Section 34's general-welfare clause to economic legislation.[5]

{¶ 61} R.C. 9.481, unlike the laws upheld under Section 34's general-welfare clause, is not economic legislation. Consequently, upholding R.C. 9.481 under Section 34's general-welfare clause would expand its scope beyond that recognized by the Ohio Supreme Court; and this, we decline to do. Furthermore, if the laws passed under Section 34's general-welfare clause do not have *some* nexus between their legislative end and the working environment, we see no boundary to the state's power over the employee and employer. We cannot agree that the 1912 Constitutional delegates intended such a result.

## E. Conclusion

{¶ 62} First, we determined that Section 34's plain language provides that laws may be passed providing for the "general welfare of all employes." Second, since the plain meaning of the term "employes" can be more limited than simply signifying a status and is, therefore, ambiguous, we applied the statutory doctrine of noscitur a sociis and determined that the general-welfare clause should be limited to the working environment. Third, we analyzed the legislative history, including the historical context in which Section 34 was passed and the debates, and again determined that Section 34's general-welfare clause should be limited to the working environment. Fourth and finally, we analyzed Section 34 general welfare case law and determined that although Section 34 general-welfare powers

---

5. That is not to say that Section 34's *only* purpose was to address economic concerns or only minimum wages. As we have explained, the plain language of Section 34 also provides for (1) hours of labor, (2) minimum wages, (3) health, (4) comfort, and (5) safety. See *Rocky River*, 43 Ohio St.3d at 14–16, 539 N.E.2d 103.

are broad, they are broad within the context of the working environment. Further, we noted that cases interpreting Section 34's general-welfare clause are limited to laws affecting employee economic welfare.

{¶ 63} For all these reasons, we conclude that laws enacted pursuant to Section 34's general-welfare clause must, at minimum, have *some* nexus between their legislative end and the working environment. Since R.C. 9.481 lacks any nexus between its legislative end—restricting political subdivisions from requiring residency as condition of employment—and the working environment, we hold that R.C. 9.481 was not validly enacted pursuant to Article II, Section 34 of the Ohio Constitution.

{¶ 64} Lima's assignment of error two is therefore sustained.

### ·Assignment of Error No. I

The trial court erred in finding R.C. 9.481 is a general law of statewide concern

{¶ 65} Lima's second assignment of error having been sustained, Lima's first assignment of error is now relevant and dispositive to this case. In its first assignment of error, Lima argues that the trial court incorrectly determined that R.C. 9.481 is constitutional pursuant to the doctrine of statewide concern. Lima contends that the trial court did not apply the doctrine of statewide concern within the context of the *Canton* test. Under a proper formulation of the *Canton* test, argues Lima, R.C. 9.481 is not a "general law"; and therefore, does not supersede Lima's home-rule authority. In addition, Lima argues that its residency requirement is a matter of local self-government; and therefore, prevails under the *Canton* test.[6]

{¶ 66} The state argues that regulation of residency requirements has transformed into a matter of statewide concern due to the extraterritorial effects that such requirements have on other communities. Further, the state argues that since Lima enacted its residency pursuant to its local self-government power and not its police power, the *Canton* test does not apply. We disagree with the state's interpretation of the applicable case law and therefore find that the state's arguments lack merit.

{¶ 67} First, the state's argument that *Canton* does not apply when a municipality acts pursuant to its local self-government power is correct, but it certainly does not mean that the state prevails.[7]

---

6. Both the state and Lima concede that *Canton* prong one is met. The disagreement is whether prongs two and three are met.

7. In fact, Lima is arguing that its residency requirement was passed pursuant to its local self-government power and therefore *Canton* prong two fails.

The first step in a home-rule analysis is to determine "whether the matter in question involves an exercise of local self-government or an exercise of local police power." If an allegedly conflicting city ordinance relates solely to self-government, the analysis stops, because the Constitution authorizes a municipality to exercise all powers of local self-government within its jurisdiction. On the other hand, if, as is more likely, the ordinance pertains to concurrent police power rather than the right to self-government, the ordinance that is in conflict must yield in the face of a general state law.

(Citations omitted.) *Am. Fin. Servs. Assn. v. Cleveland,* 112 Ohio St.3d 170, 2006-Ohio-6043, 858 N.E.2d 776, ¶ 23, citing *Twinsburg v. State Emp. Relations Bd.* (1988), 39 Ohio St.3d 226, 228, 530 N.E.2d 26, overruled on other grounds, *Rocky River,* 43 Ohio St.3d 1, 539 N.E.2d 103. On the contrary, if Lima enacted its residency requirement pursuant to its local self-government power, the "analysis stops, because the Constitution authorizes a municipality to exercise all powers of local self-government within its jurisdiction," and Lima prevails. Id.

{¶ 68} This result is also supported from the fact that the *Canton* three-prong preemption test was developed in order to determine whether a municipal ordinance must yield to the provisions of a state statute. *Canton v. State,* 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, ¶ 9; *Ohio Assn. of Private Detective Agencies, Inc. v. N. Olmsted,* 65 Ohio St.3d 242, 244, 602 N.E.2d 1147. *Canton* prong two requires that: "the ordinance is an exercise of the police power, rather than local self-government." Therefore, if (1) the *Canton* test determines whether a municipal ordinance must yield to the provisions of a state statute, (2) *Canton* prong two requires that Lima enacted its residency requirement pursuant to the police power, and (3) Lima enacted its residency requirement as an act of local self-government as the state argues, then Lima's ordinance need not yield to R.C. 9.481.

{¶ 69} Second, the state is appealing to the doctrine of statewide concern as an independent ground for preemption. That argument, however, was rejected by the Ohio Supreme Court in *Am. Fin. Servs.,* supra. The Ohio Supreme Court explained, "We recognize, however, that the application of 'statewide concern' as a separate doctrine has caused confusion, because some courts have considered the doctrine a separate ground upon which the state may regulate." 112 Ohio St.3d 170, 2006-Ohio-6043, 858 N.E.2d 776, at ¶ 29, citing *Dayton,* 157 Ohio App.3d 736, 2004-Ohio-3141, 813 N.E.2d 707, ¶ 32–76. The court in *Am. Fin. Servs.* clarified that the statewide-concern doctrine is *part of* the *Canton* three-prong preemption test and used to determine whether "the ordinance is an exercise of the police power, rather than local self-government" (*Canton* prong two). *Canton,* 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, at ¶ 9.

{¶ 70} Since we do not believe that the state intended to admit that *Canton* prong two is lacking, we will proceed with the *Canton* analysis, beginning with Lima's first argument that R.C. 9.481 is not a "general law" as required by *Canton* prong three. If *Canton* prong three is met, we must determine whether *Canton* prong two is met; however, if prong three is not met, then the *Canton* test fails and the inquiry is over.

{¶ 71} Prong three of *Canton*'s preemption test requires that the state statute be a "general law." 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, at ¶ 9. Whether the state statute is a general law is, itself, determined by a separate four-prong test. Id. at ¶ 21. To be a general law under prong three of *Canton*'s preemption test, the statute must

(1)be part of a statewide and comprehensive legislative enactment, (2) apply to all parts of the state alike and operate uniformly throughout the state, (3) set forth police, sanitary, or similar regulations, rather than purport only to grant or limit legislative power of a municipal corporation to set forth police, sanitary, or similar regulations, and (4) prescribe a rule of conduct upon citizens generally.

Id. Lima argues that R.C. 9.481 does not meet prongs three and four of the *Canton* general-law test. We agree.

## A. Police, Sanitary, or Similar Regulation

{¶ 72} The court in *Canton* explained that "general laws" within Section 3, Article XVIII of the Ohio Constitution means "statutes setting forth police, sanitary or similar regulations and not statutes which purport only to grant or to limit the legislative powers of a municipal corporation to adopt or enforce police, sanitary or other similar regulations." 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, at ¶ 31, citing *W. Jefferson v. Robinson,* 1 Ohio St.2d 113, 30 O.O.2d 474, 205 N.E.2d 382, at paragraph three of the syllabus. R.C. 9.481 provides: "Except as otherwise provided in division (B)(2) of this section, no political subdivision shall require any of its employees, as a condition of employment, to reside in any specific area of the state." Thus, on its face, R.C. 9.481 clearly purports "to limit the legislative powers of a municipal corporation to adopt or enforce police, sanitary or other similar regulations." Id.

{¶ 73} However, in *Canton* the court determined that paragraph three of *Robinson,* supra, really meant "that a statute which prohibits the exercise by a municipality of its home rule powers *without such statute serving an overriding statewide interest* would directly contravene the constitutional grant of municipal power." (Emphasis added.) Id., citing *Clermont Environmental Reclamation Co. v. Wiederhold* (1982), 2 Ohio St.3d 44, 48, 2 OBR 587, 442 N.E.2d 1278. Thus,

the critical inquiry in this case is whether allowing political subdivision employees to reside in any part of the state is an "overriding state interest."

{¶ 74} The court in *Canton* did not explain what it meant by "overriding state interest," nor did it definitely conclude that the law at issue in that case was one such "overriding state interest." Rather, the court in *Canton* merely concluded that "R.C. 3781.184(C), on its face, *appears* to serve an overriding state interest in providing more affordable housing options across the state." (Emphasis added.) 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, at ¶ 33. The court in *Clermont*, on the other hand, concluded that the issue of "whether there will be safe and properly operated hazardous waste disposal facilities within this state to receive the potentially dangerous wastes from Ohio industry and, by so doing, prevent such wastes from fouling our water and countryside" was an overriding state interest. 2 Ohio St.3d at 49, 2 OBR 587, 442 N.E.2d 1278.

{¶ 75} Even if there may be a state interest at stake in this case, it is not an "overriding" one. When passing R.C. 9.481, the General Assembly declared its intent to recognize "[t]he inalienable and fundamental right of an individual to choose where to live pursuant to Section 1 of Article I, Ohio Constitution." Sub.S.B. No. 82, 2. However, "[i]nterpretation of the state and federal Constitutions is a role exclusive to the judicial branch." *Beagle v. Walden* (1997), 78 Ohio St.3d 59, 62, 676 N.E.2d 506. Although the citizens of Ohio may have a right to determine where they live under Article 1, Section 1, citizens do not have a right to live where they want *and* demand employment with a particular employer. See *Smeltzer v. Smeltzer* (Nov. 24, 1993), 7th Dist. No. 92–C–50, 1993 WL 488235, at *1, citing *Allison v. Akron* (1974), 45 Ohio App.2d 227, 343 N.E.2d 128; *Cutshall v. Sundquist* (C.A.6, 1999), 193 F.3d 466, 479; *Morgan v. Cianciola* (Dec. 28, 1987) 7th Dist. No. 87 C.A. 130, 1987 WL 31935, at *1 ("The constitution does not guarantee the right to hold a specific job with a particular employer, but, rather, the right 'to follow a chosen trade or occupation, and to earn a livelihood for oneself * * *' ").

{¶ 76} Certainly the preservation of a constitutional right would be an "overriding state interest" on the same scale as the state's interest in protecting the water supply from hazardous waste. However, there is no constitutional right to choose where one lives and, at the same time, demand employment from an unwilling employer. So, the state's interest in prohibiting political subdivisions from passing residency restrictions is not an "overriding" one, like the state's interest was in *Clermont*, supra.

{¶ 77} On the other hand, Lima's interest in establishing residency as a qualification of employment is substantial. The mayor of Lima gave several important reasons for the residency requirement; specifically, that it

(1) promotes the City's interest in the employment of individuals who are highly committed to the betterment of the City where they both live and work;

(2) enhances the quality of work performance by employing individuals who are knowledgeable about and aware of issues and conditions in the City;

(3) promotes the employment of individuals with a greater empathy for the real and long term concerns and problems of the people of Lima;

(4) promotes the development and maintenance of a workforce with a greater personal stake in working to ensure the City of Lima's improvement and progress over the long term;

(5) promotes the availability of resident employees who are easily available for emergency situations and who can respond promptly if on-call for certain duties;

(6) promotes the ability of the City to maintain a workforce that reflects the racial and ethnic diversity of its population and its absence would undermine those efforts;

(7) produces economic benefits that flow to a city from having resident employees which are of a particular importance in an economically depressed city such as Lima;

(8) promotes the value of real estate in the City;

(9) promotes the development and maintenance of strong neighborhoods anchored by stable, wage-earning City employees and their families; and

(10) promotes numerous other benefits to the City of Lima and helps avoid other harms.

(Mayor of Lima Affidavit at 8). In addition to these reasons, the qualification, duties, and selection of municipal officers has traditionally been within a municipality's home-rule authority. *State ex rel. Lentz, v. Edwards* (1914), 90 Ohio St. 305, 107 N.E. 768; *State ex rel. Frankenstein v. Hillenbrand* (1919), 100 Ohio St. 339, 343–345, 126 N.E. 309; *State ex rel. Mullin v. Mansfield* (1971), 26 Ohio St.2d 129, 55 O.O.2d 239, 269 N.E.2d 602; *N. Ohio Patrolmen's Benevolent Assn. v. Parma* (1980), 61 Ohio St.2d 375, 15 O.O.3d 450, 402 N.E.2d 519; *State Personnel Bd. of Review v. Bay Village Civ. Serv. Comm.* (1986), 28 Ohio St.3d 214, 216, 28 OBR 298, 503 N.E.2d 518. The Ohio Supreme Court has extended the home-rule authority to the appointment and regulation of police officers and other civil service functions as well. *Harsney v. Allen* (1953), 160 Ohio St. 36, 40, 50 O.O. 492, 113 N.E.2d 86, citing *State ex rel. Lentz v. Edwards* (1914), 90 Ohio St. 305, 107 N.E. 768; *State ex rel. Regetz v. Cleveland Civ. Serv. Comm.* (1995), 72 Ohio St.3d 167, 169, 648 N.E.2d 495, citing *State ex rel. Canada v. Phillips* (1958), 168 Ohio St. 191, 5 O.O.2d 481, 151 N.E.2d 722; *State ex rel. Meyers v. Columbus* (1995), 71 Ohio St.3d 603, 606, 646 N.E.2d 173, citing *State ex rel.*

*Bardo v. Lyndhurst* (1988), 37 Ohio St.3d 106, 108, 524 N.E.2d 447; *State ex rel. Hipp v. N. Canton* (1996), 75 Ohio St.3d 221, 224, 661 N.E.2d 1090. Lima has a similar interest in the qualifications of its other employees as well, and exercising legislative authority in furtherance of this interest should be within the home-rule authority.

{¶ 78} Even if the state had an "overriding" interest in this case, R.C. 9.481 has several exceptions similar to the law in *Canton,* which defeats the state's proposed interest. The court in *Canton* recognized that the state's proposed interest in passing R.C. 3781.184(C) was to provide affordable housing options across the state; however, the law had an exception for restrictive covenants in private deeds. 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, at ¶ 33, citing R.C. 3781.184(D). The court in *Canton* found that this exception actually defeated the state's purpose; and therefore, the law failed to set forth police, sanitary, or similar regulations and only served to limit the legislative authority of municipalities. Id.

{¶ 79} The General Assembly's purpose in passing R.C. 9.481 was

to generally allow the employees of Ohio's political subdivisions to choose where to live, and that it is necessary to generally prohibit political subdivisions from requiring their employees, as a condition of employment, to reside in any specific area of the state in order to provide for the comfort, health, safety, and general welfare of those public employees.

Sub.S.B. No. 82, Section 3. First, R.C. 9.481, like R.C. 3781.184(C), on its face exempts private parties and the state, itself. R.C. 9.481(C). Second, like R.C. 3781.184(C), R.C. 9.481 has two further exemptions for "volunteers" and for employees required to respond to "emergencies" or "disasters." R.C. 9.481(B)(2)(a) and (B)(2)(b). Thus, R.C. 9.481 has exemptions that defeat its purpose of generally prohibiting residency restrictions and, like the law at issue in *Canton,* fails to set forth police, sanitary, or similar regulations.

{¶ 80} We, therefore, find that R.C. 9.481 does not set forth police, sanitary, or similar regulations but merely limits the municipality's power to do the same, and prohibiting political subdivisions from requiring residency as a condition of employment is not an overriding state interest sufficient to meet prong three of *Canton*'s general-law test.

## B. Prescribing a Rule of Conduct on Citizens Generally

[17] {¶ 81} Prong four of *Canton*'s general-law test requires that the statute "prescribe a rule of conduct upon citizens generally." 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, at ¶ 21. The court in *Canton* explained that a general law " 'is [not] a limitation upon law making by municipal legislative bodies' " and has " 'no special relation to any of the political subdivisions of the state.' " 95

Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, at ¶ 34, 38, citing *Youngstown v. Evans* (1929), 121 Ohio St. 342, 168 N.E. 844 (statute providing "that all municipal corporations shall have general power 'to make the violation of ordinances a misdemeanor, and to provide for the punishment thereof by fine or imprisonment, or both, but such fine shall not exceed five hundred dollars and such imprisonment shall not exceed six months'" does not prescribe a rule of conduct upon citizens generally); *Schneiderman v. Sesanstein* (1929), 121 Ohio St. 80, 84, 167 N.E. 158 (speed limits), quoting *Froelich v. Cleveland* (1919), 99 Ohio St. 376, 386, 124 N.E. 212; *Clermont,* 2 Ohio St.3d 44, 2 OBR 587, 442 N.E.2d 1278 (hazardous-waste facility).

{¶ 82} This same standard has been applied by the Ohio Supreme Court in other home-rule cases. *Robinson,* 1 Ohio St.2d at 117, 30 O.O.2d 474, 205 N.E.2d 382 (statute that purported to grant a municipality power to license solicitors does not prescribe a rule of conduct upon citizens generally); *Linndale v. State* (1999), 85 Ohio St.3d 52, 55, 706 N.E.2d 1227 (prohibiting local law-enforcement officers from issuing speeding and excess-weight citations on interstate freeways does not prescribe a rule of conduct upon citizens generally).

{¶ 83} Like the statutes in *Canton, Youngstown,* and *Linndale,* R.C. 9.481 only purports to limit a municipality's legislative power and has a special relationship to the state political subdivisions. R.C. 9.481's plain language states: "Except as otherwise provided in division (B)(2) of this section, no political subdivision shall require any of its employees, as a condition of employment, to reside in any specific area of the state." R.C. 9.481 is, on its face, a limitation of local legislative power and applies only to political subdivisions. As such, it fails prong four of *Canton*'s general-law test.

## C. Conclusion of *Canton*'s General–Law and Preemption Tests

{¶ 84} R.C. 9.481 fails prongs three and four of *Canton*'s general-law test; therefore, R.C. 9.481 does not preempt Lima Ordinance No. 201–00 since it fails *Canton*'s three-part preemption test. 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, at ¶ 9, 21. Because we have determined that R.C. 9.481 fails prong three of *Canton*'s preemption test and all three prongs must be met, we need not consider the parties' arguments on whether R.C. 9.481 also fails prong two of *Canton*'s preemption test. Id., at ¶ 9. Since R.C. 9.481 fails *Canton*'s preemption test, it violates Section 3, Article XVIII of the Ohio Constitution. Id., 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, at ¶ 39.

{¶ 85} Lima's second assignment of error is, therefore, sustained.

### Assignment of Error No. III

The trial court erred in not finding R.C. 9.481 violates Article II, Section 26 of the Ohio Constitution.

{¶ 86} In its third assignment of error, Lima argues that the trial court erred in not finding that R.C. 9.481 violates Section 26, Article II of the Ohio Constitution (the Uniformity Clause). Since we have decided that R.C. 9.481 violates Section 3, Article XVIII of the Ohio Constitution, we need not decide whether it also violates the Uniformity Clause. *Canton*, 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, at ¶ 39; *Linndale*, 85 Ohio St.3d at 55, 706 N.E.2d 1227.

## V. Conclusion

{¶ 87} A few closing remarks are appropriate before we conclude. We understand that residency requirements have a real impact on Ohio citizens and are often felt most by working families. Were we members of the Ohio legislature, our decision might be different than that required of us today. We, however, are judicial officers and have taken an oath to uphold the Ohio Constitution and the laws of this state—and to that oath we hope to be found faithful by those who have so entrusted us. Thus constrained, we summarize our conclusions of law:

{¶ 88} R.C. 9.481 was not validly enacted pursuant to Section 34, Article II of the Ohio Constitution, because Section 34's language, legislative history, and case law support finding that laws providing for the "general welfare of all employes" must have, at minimum, some nexus between their legislative end and the working environment.

{¶ 89} R.C. 9.481 is not a general law under *Canton* that would preempt Lima Ordinance No. 201–00; therefore, R.C. 9.481 violates Section 3, Article XVIII of the Ohio Constitution. Lima Ordinance No. 201–00 is a valid exercise of local self-government pursuant to Section 3, Article XVIII of the Ohio Constitution and prevails, R.C. 9.481 notwithstanding.

{¶ 90} Having found error prejudicial to the appellant herein in the particulars assigned and argued, we reverse the judgment of the trial court and remand the cause for further proceedings consistent with this opinion.

Judgment reversed
and cause remanded.

ROGERS, P.J., and WILLAMOWSKI, J., concur.