DAYTON, Appellant,

v.

The STATE of Ohio et al., Appellees.

[Cite as *Dayton v. State*, 176 Ohio App.3d 469, 2008-Ohio-2589.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 22221.

Decided May 30, 2008.

Green & Green, Thomas M. Green, Jane M. Lynch, and Jared A. Wagner, for appellant.

Nancy Hardin Rogers, Attorney General, and Frank M. Strigari and Julie Kelley Cannatti, Assistant Attorneys General, for appellee the state of Ohio.

Trisha M. Duff, for appellee IAFF Local # 136.

Livorno & Arnett Co., L.P.A. and Henry A. Arnett, for amicus curiae Ohio Association of Professional Fire Fighters.

FAIN, Judge.

{¶ 1} Plaintiff-appellant, the city of Dayton, has a residency requirement for employees. Defendant-appellee the state of Ohio has enacted a statute that prohibits a political subdivision of the state from imposing residency requirements for its employees. This appeal concerns the constitutionality, under the Ohio Constitution, of the state's restriction on residency requirements. Specifically, Dayton appeals from a summary judgment rendered in favor of the state and third-party defendant-appellee International Association of Firefighters Lo-

cal # 136 ("IAFF # 136"). After considering cross-motions for summary judgment, the trial court rendered summary judgment in favor of the state and IAFF # 136. In so doing, the trial court upheld the constitutionality of R.C. 9.481, which prohibits political subdivisions from requiring full-time employees, as a condition of employment, to reside in any specific area of the state.

{¶ 2} Dayton contends that the trial court erred in finding that R.C. 9.481 was enacted pursuant to Section 34, Article II of the Ohio Constitution and in finding that R.C. 9.481 prevails over residency requirements adopted under Dayton's home-rule authority. Dayton also contends that the trial court erred in holding that R.C. 9.481 satisfies requirements for preempting local ordinances.

{¶ 3} According to Dayton, R.C. 9.481 is an impermissible attempt by the legislature to interpret the Ohio Constitution and create a right at variance with holdings of both the Supreme Court of the United States and the Supreme Court of Ohio. Finally, Dayton contends that R.C. 9.481 violates Section 26, Article II of the Ohio Constitution.

{¶ 4} We conclude that the enactment of R.C. 9.481 is authorized by the broad grant of authority to provide for the general welfare of working persons provided for in Section 34, Article II of the Ohio Constitution, that may not be impaired by the home-rule provision in Section 3, Article XVIII of the Ohio Constitution, or by any other provision of the Ohio Constitution, including the preamble.

{¶ 5} Because we conclude that R.C. 9.481 is authorized by Section 34, Article II of the Ohio Constitution, we need not consider Dayton's argument that the statute violates the home-rule provision of Section 3, Article XVIII, in that it conflicts with provisions of an ordinance adopted pursuant to home-rule powers.

{¶ 6} Finally, we conclude that the General Assembly did not impermissibly interfere with the role of the judiciary by enacting R.C. 9.481, nor does the statute itself violate the Uniformity Clause. Accordingly, the judgment of the trial court is affirmed.

I

{¶ 7} In 1912, Ohio citizens approved various amendments to their constitution, including Article XVIII ("the home rule amendment"), which allowed municipalities the ability to adopt charters and to exercise powers of self-government. Article II was adopted during the same process and gave Ohio's legislature broad authority over employee welfare.

{¶ 8} In 1913, Dayton adopted its first charter. Subsequently, in 1978, Dayton's City Commission adopted Ordinance No. 25558. This ordinance required all employees in Dayton's Civil Service to be actual residents and reside physically in the city of Dayton, and to continue to live in the city during the term

of their employment. The commission also enacted Ordinance No. 27505 in 1987, for the purpose of placing the residency issue before the electorate. Based on the approval of the electorate in March 1987, Section 102 was placed in Dayton's charter.

{¶ 9} Section 102 provides:

{¶ 10} "(A) All employees in the Civil Service of the City of Dayton, appointed after the effective date of this Charter section, must and shall be actual residents of and physically live in the City of Dayton at the time of their appointment, and shall continue to be actual residents and physically live in the City of Dayton during the term of their employment.

{¶ 11} "(B) All employees in the Civil Service of the City of Dayton, required by Ordinance No. 25558, dated June 28, 1978, and/or personnel regulations, including, but not specifically limited to, Personnel Policies and Procedures Manual § 2.01, originally adopted June 28, 1978, as § 9.10 and revisions thereof, to have actual residence and physically live in the City of Dayton at the time of the effective date of this Charter section shall and must continue to be actual residents of and physically live in the City of Dayton during the term of their employment.

{¶ 12} "(C) Irrespective and notwithstanding any other provision of this Charter, violation of the provisions of this section shall result in discharge.

{¶ 13} "(D) The Commission may enact such ordinances as may be necessary and consistent with implementation of this section." Revised Code of General Ordinances of the City of Dayton ("R.C.G.O.") 102.

{¶ 14} Consistent with R.C.G.O. 102, Dayton employees have been required to reside in Dayton as a condition of employment, and the requirement has been routinely enforced.

{¶ 15} In 2006, the General Assembly passed S.B. 82, which became effective as R.C. 9.481, in May 2006. R.C. 9.481 applies to all political subdivisions and provides:

{¶ 16} "(B)(1) Except as otherwise provided in division (B)(2) of this section, no political subdivision shall require any of its employees, as a condition of employment, to reside in any specific area of the state.

{¶ 17} "(2)(a) Division (B)(1) of this section does not apply to a volunteer.

{¶ 18} "(b) To ensure adequate response times by certain employees of political subdivisions to emergencies or disasters while ensuring that those employees generally are free to reside throughout the state, the electors of any political subdivision may file an initiative petition to submit a local law to the electorate, or the legislative authority of the political subdivision may adopt an ordinance or

resolution, that requires any individual employed by that political subdivision, as a condition of employment, to reside either in the county where the political subdivision is located or in any adjacent county in this state. * * *

{¶ 19} "(C) Except as otherwise provided in division (B)(2) of this section, employees of political subdivisions of this state have the right to reside any place they desire."

{¶ 20} The statute defines a "volunteer" as "a person who is not paid for service or who is employed on less than a permanent full-time basis." R.C. 9.481(A)(2). Thus, after R.C. 9.481 became effective, Dayton's full-time employees were no longer required to live in the city as a condition of employment. However, volunteers or part-time employees could be subjected to a residency requirement.

{¶ 21} Dayton was dissatisfied with this situation and filed a declaratory judgment action against the state of Ohio in May 2006, asking the trial court to declare that R.C. 9.481 is invalid and unenforceable and that it violates the Ohio Constitution. Dayton also asked for preliminary and permanent injunctions barring enforcement of the statute.

{¶ 22} After the state filed an answer, IAFF # 136 was given permission to intervene as a third-party defendant. All parties then filed cross-motions for summary judgment. Dayton noted in its motion that the city's population had been declining steadily since the 1970 census. As of November 2006, Dayton had 2,195 employees, 70 percent of whom resided in the northeast and southeast portions of the city. Of these individuals, 819 are employed in the police and fire departments, and 80 percent live in the northeast and southeast sections of the city.

{¶ 23} Dayton's motion also noted that in February 2005, the city had 2,500 vacant residential properties. Dayton's economic expert predicted an adverse effect on the city's population, property values, and tax revenues if the residency requirement were abolished.

{¶ 24} According to the state, the General Assembly found that 125 cities and 13 villages in Ohio subject employees to residency requirements. The General Assembly also made the following legislative comments when it enacted S.B. 82:

{¶ 25} "Section 2. In enacting section 9.481 of the Revised Code in this act, the General Assembly hereby declares its intent to recognize both of the following:

{¶ 26} "(A) The inalienable and fundamental right of an individual to choose where to live pursuant to Section 1 of Article I, Ohio Constitution.

{¶ 27} "(B) Section 34 of Article II, Ohio Constitution, specifies that laws may be passed providing for the comfort, health, safety, and general welfare of all employees, and that no other provision of the Ohio Constitution impairs or limits this power, including Section 3 of Article XVIII, Ohio Constitution.

{¶ 28} "Section 3. The General Assembly finds, in enacting section 9.481 of the Revised Code in this act, that it is a matter of statewide concern to generally allow the employees of Ohio's political subdivisions to choose where to live, and that it is necessary to generally prohibit political subdivisions from requiring their employees, as a condition of employment, to reside in any specific area of the state in order to provide for the comfort, health, safety, and general welfare of those public employees."

{¶ 29} In June 2007, the trial court granted summary judgment in favor of the state and IAFF # 136 and denied Dayton's motion for summary judgment. The court concluded that R.C. 9.481 was properly enacted under the "general welfare" clause of Section II, Article 34 of the Ohio Constitution, which prevails over the home-rule provision in Section 3, Article XVIII of the Ohio Constitution. The court further concluded that even if Section 34 does not control, R.C. 9.481 is a general law that takes precedence over Dayton's city charter. Finally, the trial court held that R.C. 9.481 does not violate the Uniformity Clause of Section 26, Article II of the Ohio Constitution.

{¶ 30} Dayton appealed from the decision and also requested a stay of the trial court's decision pending appeal. A stay was granted in August 2007.

## II

{¶ 31} Dayton's first assignment of error is as follows:

{¶ 32} "The trial court erred in finding that R.C. 9.481 was enacted pursuant to Section 34, Article II of the Ohio Constitution."

{¶ 33} Under this assignment of error, Dayton contends that the trial court improperly extended the scope of Section 34, Article II of the Ohio Constitution by interpreting "general welfare" to include every law that even tangentially affects employment. Dayton also claims that the phrase "general welfare" is ambiguous and that the history and legislative debates accompanying the passage of Section 34 reveal that "general welfare" pertains only to working conditions, not other aspects of employment like residency. Finally, Dayton argues that the "general law" test used in home-rule cases applies to Section 34 analysis. According to Dayton, R.C. 9.481 is not a general law under home-rule standards and cannot prevail over conflicting municipal regulations.

{¶ 34} Before we address these arguments, we should note that we have reviewed the briefs of the parties, as well as a brief filed by amicus curiae, Ohio

Association of Professional Fire Fighters. We have also considered supplemental authority filed by both Dayton and the state.

{¶ 35} Turning now to the merits, we begin with the fundamental principle that courts "must 'presume the constitutionality of lawfully enacted legislation.'" (Citations omitted.) *Klein v. Leis*, 99 Ohio St.3d 537, 2003-Ohio-4779, 795 N.E.2d 633, at ¶ 4. Therefore, when "we consider the constitutionality of * * * legislation passed by the General Assembly, we presume it to be constitutional and will not declare it to be unconstitutional unless it 'appear[s] beyond a reasonable doubt that the legislation and constitutional provisions are clearly incompatible.'" *Kelleys Island Caddy Shack, Inc. v. Zaino*, 96 Ohio St.3d 375, 376, 2002-Ohio-4930, 775 N.E.2d 489 at ¶ 10, quoting *State ex rel. Dickman v. Defenbacher* (1955), 164 Ohio St. 142, 57 O.O. 134, 128 N.E.2d 59, paragraph one of the syllabus.

{¶ 36} R.C. 9.481 was enacted pursuant to Section 34, Article II of the Ohio Constitution, which provides:

{¶ 37} "Laws may be passed fixing and regulating the hours of labor, establishing a minimum wage, and providing for the comfort, health, safety and general welfare of all employees; and no other provision of the constitution shall impair or limit this power."

{¶ 38} Section 34 was among a number of constitutional amendments that were proposed by the 1912 Constitutional Convention and approved by voters. Another amendment adopted during this process was Article XVIII, which is known as the home rule amendment. Section 3 of Article XVII is considered a key part of the home rule amendment, and states:

{¶ 39} "Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws."

{¶ 40} Dayton contends that its residency requirement involves the exercise only of local self-government and must prevail over any conflicting state legislation. Conversely, the state and IAFF # 136 argue that valid enactments under Section 34, Article II of the Ohio Constitution must prevail over conflicting local ordinances, due to the supremacy of Section 34.

{¶ 41} In *Rocky River v. State Emp. Relations Bd.* (1989), 43 Ohio St.3d 1, 539 N.E.2d 103 ("*Rocky River IV*"), the Ohio Supreme Court considered the constitutionality of a statute requiring binding arbitration of disputes between a city and its safety forces. Id. at 1–2, 539 N.E.2d 103.[1] The city argued that

---

1. The Ohio Supreme Court issued four decisions in the *Rocky River* case, and the one cited in the main text is the last decision issued, in May 1989. Because the last decision is commonly referred to as *Rocky River IV*, we will use that designation throughout the rest of our opinion.

the statute unconstitutionally denied cities the power to determine municipal safety employee compensation, in violation of the home-rule sections in Article XVIII.  Id. at 12, 539 N.E.2d 103.  However, the Ohio Supreme Court concluded that Section 34 of Article II governed and that the home-rule sections of the Constitution did not apply.  Id. at 13, 539 N.E.2d 103.

{¶ 42} In discussing Section 34, the Supreme Court stressed:

{¶ 43} "This provision constitutes a broad grant of authority to the legislature to provide for the welfare of all working persons, including local safety forces. * * * The provision expressly states in 'clear, certain and unambiguous language' that *no other provision* of the Constitution may impair the legislature's power under Section 34.  * * * This prohibition, of course, includes the 'home rule' provision contained in Section 3, Article XVIII."  *Rocky River IV,* 43 Ohio St.3d at 13, 539 N.E.2d 103, quoting from *State ex rel. Bd. of Trustees of Police & Firemen's Pension Fund v. Bd. of Trustees of Police Relief* (1967), 12 Ohio St.2d 105, 106, 41 O.O.2d 410, 233 N.E.2d 135.  The Ohio Supreme Court, therefore, concluded that because the statute in question was concerned with the general welfare of employees, "pursuant to Section 34, Article II, the power of the General Assembly to adopt the act *may not be affected in any way by the 'home rule' amendment.*"  (Emphasis sic.)  Id.

{¶ 44} In *Rocky River IV,* the city argued that Section 34 did not apply to conciliation, but was intended to apply only to matters involving minimum wage. In rejecting this contention, the Ohio Supreme Court first focused on the history of Section 34, including the constitutional debates.  After discussing the constitutional debates in detail, the court stressed:

{¶ 45} "But none of this really makes any difference.  The language of Section 34 is so clear and unequivocal that resort to secondary sources, such as the constitutional debates, is actually unnecessary.  Where the language of a statute or constitutional provision is clear and unambiguous, it is the duty of courts to enforce the provision as written.  * * * 'Debates of a constitutional convention are proper matter for consideration where they throw light on the correct interpretation of any provision of the Constitution, but if the provision is clear and may be read without interpretation, the discussion leading to its adoption is of no value, nor are the various statements by the members of the convention and the resolutions offered during the convention determinative of the meaning of the amendment.' "  * * *

{¶ 46} "Regardless of what was said or not said during the debates, the unalterable fact remains that Section 34, as it was ultimately adopted, transcends the limitations urged by appellant.  If the framers of our Constitution had intended this section to apply only to minimum wage, almost half of the forty-one words contained in this section must be regarded as mere surplusage, since it

further provides that laws may be passed 'fixing and regulating the hours of labor * * * and providing for the comfort, health, safety and general welfare of all employees * * *.' Are we to believe, as appellant apparently does, that these words were not intended to have meaning? To ask the question is to answer it." (Citations omitted.) Id. at 15–16, 539 N.E.2d 103.

{¶ 47} The Ohio Supreme Court continued:

{¶ 48} "The same may be said of the final phrase of Section 34, which states that ' * * * no other provision of the constitution shall impair or limit' the General Assembly's power to pass laws concerning the welfare of employees. * * * How can it be seriously maintained that the home-rule amendment is somehow exempt from this mandate? Section 34 could not be clearer or more unequivocal. Appellant's contention, that Section 34 does not mean what it so obviously says, is indefensible. This is especially true when one considers that this court has already held that Section 34 contains 'clear, certain and unambiguous language' providing that 'no other provision of the Constitution may impair the intent, purpose and provisions' of Section 34, including the home-rule amendment. *Pension Fund,* 12 Ohio St.2d at 107, 41 O.O.2d at 412, 233 N.E.2d at 137." *Rocky River IV,* 43 Ohio St.3d at 16, 539 N.E.2d 103.

{¶ 49} Dayton argues that we should adopt the view of the dissent in *Rocky River IV,* which argued that an overly broad interpretation of "general welfare" makes the remaining parts of Section 34, as well as Section 35, Article II of the Ohio Constitution "mere surplusage." Id. at 28, 539 N.E.2d 103, fn. 35 (Wright, J., dissenting). Justice Wright further argued in his dissent in *Rocky River IV* that the drafters of Section 34 intended to limit the General Assembly specifically to "wages, hours, and sanitary conditions in industry." Id.

{¶ 50} This is the view recently taken in *Lima v. State,* Allen App. No. 1–07–21, 2007-Ohio-6419, 2007 WL 4248278. In *Lima,* the Third District Court of Appeals concluded after a lengthy analysis:

{¶ 51} "R.C. 9.481 was not validly enacted pursuant to Article II, Section 34 of the Ohio Constitution, because Section 34's language, legislative history, and case law support finding that laws providing for the "general welfare of all employes" [sic] must have, at minimum, some nexus between their legislative end and the working environment." Id. at ¶ 88.

{¶ 52} The Third District used four methods of interpretation in reaching this conclusion: (1) the common definition of "employee"; (2) *"noscitur a sociis,"* which instructs courts to determine the meaning of statutory phrases by their immediately surrounding words; (3) the "legislative history" of Section 34; and (4) case law interpreting Section 34.

{¶ 53} The Third District conceded that "general welfare" is a broad term, but observed that the language in Section 34 is limited by its subject matter. The Third District thus framed the issue as follows:

{¶ 54} "The general-welfare clause's plain language requires that the General Assembly enact laws providing for the general welfare 'of all employes.' [sic] Lima's assignment of error, thus, raises the issue of whether the term 'employes' [sic] in Section 34 means employees acting within the scope of their employment (i.e. within the working environment) or whether 'employes' [sic] refers to the status of being an employee, which transcends any particular locus. In other words, does the term 'employes' [sic] refer to the status of being an employee 24 hours per day, which attaches at hiring and sheds at firing ('employee' in its broadest sense), or does the term have a more limited meaning, which is intricately tied to a particular locus; here, the work environment? If the later interpretation is correct, the plain language would support finding that laws passed pursuant to Section 34's general-welfare clause must address issues related to the employees' working environment as Lima argues. If the former interpretation is correct, then the plain language would support finding that laws passed pursuant to Section 34 can address issues beyond the employees' working environment as the state argues." Id. at ¶ 28.

{¶ 55} After reviewing some common definitions of "employee," the Third District concluded that the definitions did not resolve the scope of the term as used in Section 34. The Third District then focused on *"noscitur a sociis"* and concluded that because the first and second clauses of Section 34 deal with working terms and conditions "within" the employment environment, the General Assembly would be limited to enacting laws that affect employees' "work environment conditions." [2] Id. at ¶ 35.

{¶ 56} Finally, the Third District reviewed historical circumstances in the early 1900s and the content of debates that occurred during the 1912 Constitutional Convention. Id. at ¶ 37–47. In this regard, the Third District again concluded that Section 34 was intended to empower the General Assembly with legislative authority over only labor hours, a minimum wage, and the working environment itself. Id. at ¶ 46.

{¶ 57} As we noted, this is the view taken by the dissent in *Rocky River IV.* In arguing that the legislature could not enact compulsory arbitration legislation that would prevail over conflicting municipal law, Justice Wright's dissent in *Rocky River IV* suggested that "any fair-minded reader of the debates could only

---

**2.** The Third District further concluded that the words within the "general welfare clause" itself ("health, safety, and comfort") also relate to "work environment conditions." Id. at ¶ 35.

conclude that * * * [Section 34] refers to wages, hours and sanitary conditions in industry." *Rocky River IV*, 43 Ohio St.3d at 28, 539 N.E.2d 103 (Wright, J., dissenting). But this was not the view adopted by the majority of the Ohio Supreme Court.

{¶ 58} Justice Wright also reviewed case law interpreting Section 34. Like the Third District, Justice Wright concluded that Section 34 is limited in scope to "the minimum wage, hours of labor, or safety conditions." Id. at 35, 539 N.E.2d 103. Compare *Lima*, 2007-Ohio-6419, 2007 WL 4248278, at ¶ 54 (stating that "Section 34 general welfare case law is limited to employee economic welfare"). Again, this was not the view expressed by the majority opinion in *Rocky River IV*, and we are bound by that decision until it is reversed or overruled. See, e.g., *Natl. City Bank v. Rhoades*, 150 Ohio App.3d 75, 84, 2002-Ohio-6083, 779 N.E.2d 799, at ¶ 31; *Louis A. Green, P.S. v. State Bd. of Registration for Professional Engineers & Surveyors*, Greene App. No. 05CA121, 2006-Ohio-1581, 2006 WL 827374, at ¶ 20; and *State v. Davis*, Clark App. No. 2006 CA 69, 2007-Ohio-1030, 2007 WL 706802, at ¶ 43 (all referring to the binding effect of Ohio Supreme Court decisions).

{¶ 59} Furthermore, we find a logical inconsistency in the Third District's classification of the issues. In *Lima*, the Third District focused on whether "employee" refers to a status that attaches at hiring and sheds at firing (the state of Ohio's position in *Lima* ), or whether "employee" is tied to a particular locus— the working environment (the city of Lima's position). The Third District concluded that in the first situation, Section 34's "plain language" would "support finding that laws passed pursuant to Section 34 can address issues beyond the employees' working environment." *Lima*, 2007-Ohio-6419, 2007 WL 4248278, at ¶ 28. However, the Third District also stated that in the second situation, Section 34's "plain language" would "support finding that laws passed pursuant to Section 34's general-welfare clause must address issues related to the employees' working environment." Id.

{¶ 60} We find it difficult to understand how statutory language can be described as "plain" if it can be read to support each of two contrary positions. Moreover, if language is plain, it must be applied as written. See, e.g., *State v. Tuomala*, 104 Ohio St.3d 93, 96, 2004-Ohio-6239, 818 N.E.2d 272, at ¶ 11–12, and *In re Blue Flame Energy Corp.*, 171 Ohio App.3d 514, 536, 2006-Ohio-6892, 871 N.E.2d 1227, at ¶ 43. As we have already stressed, the Ohio Supreme Court concluded in *Rocky River IV* that the language in Section 34 is unambiguous and may not be impaired by the home rule amendment. *Rocky River IV*, 43 Ohio St.3d at 16, 539 N.E.2d 103.

{¶ 61} In 1999, the Ohio Supreme Court again rejected attempts to restrict Section 34, stressing that Section 34 has repeatedly been interpreted as a "broad

grant of authority to the General Assembly, not as a limitation on its power to enact legislation." *Am. Assn. of Univ. Professors, Cent. State Univ. Chapter v. Cent. State Univ.* (1999), 87 Ohio St.3d 55, 61, 717 N.E.2d 286. In *Cent. State Univ.*, the American Association of University Professors ("AAUP") alleged that the General Assembly had violated Section 34 by enacting legislation that burdened state employees. The burden consisted of an increase in the employees' instructional workloads. The Ohio Supreme Court rejected the contention that Section 34 restricts the legislature solely to the enactment of laws benefiting employees, rather than burdening employees as well. Id. at 60, 717 N.E.2d 286. In this regard, the court noted that:

{¶ 62} "The General Assembly routinely enacts legislation that serves precisely the purpose AAUP would have us declare impermissible. R.C. 3319.22, for instance, allows rules imposing continuing education requirements upon teachers; R.C. 109.801 requires police officers to undergo annual firearm training; public employees are limited by R.C. 102.03 in gifts they may receive; and classified employees are limited in their solicitations of political contributions under R.C. 124.57. Furthermore, employees of Head Start agencies and out-of-home child care employees must submit to criminal record checks (R.C. 3301.32 and 2151.86); teachers and other school employees may be required to undergo physical examinations in certain instances at the discretion of school physicians (R.C. 3313.71); an employee who contracts AIDS from a fellow employee has no cause of action in negligence against his employer (R.C. 3701.249); and board of health employees dealing with solid and infectious waste are required to complete certain training and certification programs (R.C. 3734.02).

{¶ 63} "These statutes provide only a few examples of laws burdening employees based upon legislative decisions to regulate the employment sector in the public interest. None of these statutes was enacted to benefit employees, but there can be no question that they constitute important legislation that the General Assembly has the constitutional authority to enact." 87 Ohio St.3d at 61, 717 N.E.2d 286.

{¶ 64} Some of the statutes mentioned by the Ohio Supreme Court bear no more "nexus" to the conditions of the "work environment" than the residency provisions in R.C. 9.481. *Lima,* 2007-Ohio-6419, 2007 WL 4248278, at ¶ 18. For example, R.C. 102.03 places restrictions on the outside employment of various public employees for as long as 24 months after they leave public service. Likewise, granting immunity to employers for negligent transmission of the AIDS virus by fellow employees does not bear a significant nexus to the work environment itself. Nonetheless, the legislature's power to routinely enact these measures under Section 34 has been upheld. *Cent. State Univ.*, 87 Ohio St.3d at 61, 717 N.E.2d 286. The fact that the legislative ends do not bear a "nexus" to

the conditions of the working environment does not mean that the legislature's goals in enacting these statutes are irrelevant. However, contrary to the Third District's conclusion, this does mean that Section 34 is not limited solely to legislation that bears a nexus to the conditions of the working environment as opposed to the status of being an "employee"—which attaches at hiring and is shed at firing. *Lima*, 2007-Ohio-6419, 2007 WL 4248278, at ¶ 28.

{¶ 65} In a recent decision, the Ninth District Court of Appeals employed a different analysis in assessing the constitutionality of R.C. 9.481. The issue before the Ninth District Court of Appeals was the same—whether the General Assembly acted within the authority granted by Section 34, Article II of the Ohio Constitution. See *State v. Akron*, Summit App. No. 23660, 2008-Ohio-38, 2008 WL 81506, at ¶ 9. In *Akron*, the Ninth District Court of Appeals agreed that *Rocky River IV* had taken an expansive view of the General Assembly's power under Section 34. Id. at ¶ 15–18. However, the Ninth District Court of Appeals concluded that the phrase "general welfare" in Section 34 is not without limits. Id. at ¶ 18.

{¶ 66} The Ninth District Court of Appeals stressed that while the term "general welfare" appears to be all-encompassing, it "cannot reasonably encompass everything that arguably benefits some employees." Id. Instead, some boundaries must exist. To decide the boundaries, the Ninth District Court of Appeals looked to the "common welfare" clause of the preamble to the Ohio Constitution. In this regard, the Ninth District Court of Appeals observed:

{¶ 67} "While Article II[,] Section 34 explicitly authorizes legislation for the general welfare of employees, legislation adopted under it must also either secure the blessings of freedom to citizens of Ohio or further the 'general welfare' of the state. 'All government power derives from the people, but these grants of power are limited.' * * * The scope of the power granted Ohio by its citizens is found in the preamble of the Ohio Constitution:

{¶ 68} " 'We, the people of the State of Ohio, grateful to Almighty God for our freedom, to secure its blessings and promote our common welfare, do establish this Constitution.' " (Citations omitted.) Id. at ¶ 19.

{¶ 69} Based on the preamble, the Ninth District Court of Appeals concluded that Ohio's Constitution only authorizes laws securing freedom for citizens or furthering their common welfare, and that all laws are subject to this limitation. Id. The Ninth District Court of Appeals also found no barrier to this line of thought in the Ohio Supreme Court's previous decisions. In this regard, the Ninth District Court of Appeals noted:

{¶ 70} "In interpreting the General Assembly's broad authority under Article II Section 34, the Ohio Supreme Court has recognized the societal notion of

'common welfare.' Although the Court has not explicitly articulated a limitation on the General Assembly's authority under Article II Section 34 to enact legislation for the 'general welfare' of employees, it has been unnecessary for it to do so in the prior cases before it." Id. at ¶ 20.

{¶ 71} Consistent with the "common welfare" limitation, the Ninth District Court of Appeals distinguished *Rocky River IV, Pension Fund,* and *Cent. State Univ.* because those cases involved comprehensive legislation addressing significant social issues impacting the public at large. Id. at ¶ 21–24. In contrast, the Ninth District Court of Appeals concluded that R.C. 9.481 did not affect the common welfare. The Ninth District Court of Appeals concluded that the "sole purpose" of R.C. 9.481 is as follows:

{¶ 72} "[T]o invalidate employee residency requirements by political subdivisions. This legislation does not address any significant social issues impacting the public at large; it is not part of a comprehensive legislative scheme, but deals with a single issue; and it applies to a relatively small segment of the population (those who are employed by political subdivisions, are subject to residency requirements, and would choose to live elsewhere if allowed to do so).

{¶ 73} " * * * unlike any of the legislation that the Supreme Court has determined falls within the scope of Article II[,] Section 34 as providing for the general welfare of employees, Section 9.48.1 does not pertain to the protection or regulation of any existing right or obligation of the affected employees. Instead, it is an attempt to circumvent municipal home rule authority and reinstate a 'right' that the employees voluntarily surrendered when they accepted government employment." (Brackets added.) Id. at ¶ 24–25.

{¶ 74} We note that a preamble is " 'the introductory part of a statute, ordinance, or regulation that states the reasons and intent of the law or regulation or is used for other explanatory purposes.' " *Christy v. Summit Cty. Bd. of Elections* (1996), 77 Ohio St.3d 35, 39, 671 N.E.2d 1, fn. 1, citing Webster's Third New World International Dictionary (1986) 1783. The view of the Ninth District Court of Appeals on the effect of the preamble is supported by *Palmer v. Tingle* (1896), 55 Ohio St. 423, 45 N.E. 313. In *Palmer,* the Ohio Supreme Court indicated that the preamble of Ohio's Constitution limits the powers of the General Assembly. Specifically, the court stated:

{¶ 75} "It is worthy of notice that the constitution is established to secure the blessings of freedom, and to promote the common welfare. As the constitution must be regarded as consistent with itself throughout, it must be presumed that the laws to be passed by the general assembly under the powers conferred by that instrument are to be such as shall secure the blessings of freedom, and promote our common welfare." 55 Ohio St. at 440, 45 N.E. 313.

{¶ 76} *Rocky River IV* did not consider any limitations imposed on Section 34 by the concept of "common welfare"—presumably because the Ohio Supreme Court did not need to do so. As the Ninth District Court of Appeals noted, the statute involved in *Rocky River IV* was part of comprehensive legislation encompassing an entire chapter of the Ohio Revised Code. *Akron,* 2008-Ohio-38, 2008 WL 81506, at ¶ 21. See also *Rocky River IV,* 43 Ohio St.3d at 41, 539 N.E.2d 103 (noting that the statutory section involved in the case was part of the Ohio Public Employees Collective Bargaining Act, R.C. Chapter 4117). The idea of legislating for the "common welfare" also appears in *Central State Univ.,* as the court focused on the fact that statutes previously upheld as valid had been "based upon legislative decisions to regulate the employment sector *in the public interest.*" (Emphasis added.) 87 Ohio St.3d at 61, 717 N.E.2d 286.

{¶ 77} Nevertheless, we are not persuaded that the grant of authority to the General Assembly, in Section 34, Article II of the Ohio Constitution, to pass laws providing for the general welfare of all employees, is subject to a limitation based in the preamble to the Ohio Constitution. The last clause of Section 34, Article II unequivocally declares, "and no other provision of the constitution shall impair or limit this power." The declaration includes the preamble to the Ohio Constitution as well as the home rule amendment. The effect is to render the grant of legislative power contained in Section 34, Article II plenary; no limitations to that power external to the language therein may be imposed.

{¶ 78} In short, Section 34, Article II of the Ohio Constitution gives the General Assembly the power to provide that employees of political subdivisions of the state shall be free to reside wherever they choose, because that is a provision providing for their general welfare. Dayton's first assignment of error is overruled.

### III

{¶ 79} Dayton's second assignment of error is as follows:

{¶ 80} "The trial court erred in finding that R.C. 9.481 satisfies the three part test established in *City of Canton v. State of Ohio* and preempts the requirement set forth in the city's charter that all city employees must reside within the city limits."

{¶ 81} Under this assignment of error, Dayton contends that its residency rule is a matter of local self-government and that the trial court erred in finding that R.C. 9.481 is a general law that takes precedence over Dayton's city charter. In response, the state and IAFF # 136 contend that R.C. 9.481 regulates matters of statewide concern and is a general law superseding Dayton's home rule powers. In this regard, the state also claims that R.C. 9.481 has extra-territorial effects

because it addresses the labor relationship between public-sector employers and employees and because society is no longer concentrated in insular, local communities.

{¶ 82} In view of our disposition of Dayton's first assignment of error, this assignment of error has become moot. R.C. 9.481 prevails over Dayton's city charter by reason of Section 34, Article II of the Ohio Constitution; it is not necessary to establish that it is a general law for it to prevail.

{¶ 83} Dayton's second assignment of error is overruled as moot.

## IV

{¶ 84} Dayton's third assignment of error is as follows:

{¶ 85} "The trial court erred in failing to find that R.C. 9.481 is an impermissible attempt by the legislature to interpret the constitution and create a right at variance with both the United States and Ohio Supreme Courts."

{¶ 86} Under this assignment of error, Dayton contends that the legislature impermissibly interfered with the role of the judiciary by enacting legislation that interprets Article I, Section I of the Ohio Constitution in a way that is inconsistent with existing judicial decisions. The state responds by noting that Dayton failed to raise a "separation of powers" argument in its complaint. Citing *Johns v. Univ. of Cincinnati Med. Assoc., Inc.*, 101 Ohio St.3d 234, 2004-Ohio-824, 804 N.E.2d 19, the state also points out that the General Assembly may pass any law that is not constitutionally forbidden.

{¶ 87} In this regard, we agree with the state. In *Johns*, the Ohio Supreme Court stated, " '[T]he state Constitution is primarily a limitation on legislative power of the General Assembly; therefore, the General Assembly may pass any law unless it is specifically prohibited by the state or federal Constitutions.' " (Citations omitted.) Id. at ¶ 35. If a particular law conflicts with existing case law, that is a matter for the courts to resolve. Consistent with this principle, the Ohio Supreme Court has declared legislation invalid or unconstitutional on numerous occasions. The General Assembly has also exercised the option of enacting legislation to supersede decisions with which it disagrees. A classic example of this interplay is the uninsured-/underinsured-motorists statute, which has long been a battleground between the legislature and courts. See R.C. 3937.18 and its uncodified law, indicating an intention to supersede various Ohio Supreme Court decisions, including *Scott–Pontzer v. Liberty Mut. Fire Ins. Co.* (1999), 85 Ohio St.3d 660, 710 N.E.2d 1116, and *Savoie v. Grange Mut. Ins. Co.* (1993), 67 Ohio St.3d 500, 620 N.E.2d 809.

{¶ 88} Dayton points to no federal or state constitutional provisions that specifically prohibit enactment of R.C. 9.481. As a result, the General Assembly was not precluded from enacting the statute.

{¶ 89} Dayton's third assignment of error is overruled.

V

{¶ 90} Dayton's fourth assignment of error is as follows:

{¶ 91} "The trial court erred in finding that R.C. 9.481 does not violate Section 26, Article II of the Ohio Constitution."

{¶ 92} Dayton contends under this assignment of error that the trial court erred in failing to find that R.C. 9.481 violates the Uniformity Clause of the Ohio Constitution. In this regard, Dayton argues that R.C. 9.481 is unconstitutional because it creates arbitrary distinctions between full-time and part-time municipal employees. As we mentioned, R.C. 9.481(B)(1) provides that political subdivisions may not require employees to reside in any specific area of the state as a condition of employment. However, certain individuals, defined as either volunteers or persons with less than full-time employment, may be subjected to residency requirements.

{¶ 93} Section 26, Article II of the Ohio Constitution states:

{¶ 94} "All laws, of a general nature, shall have a uniform operation throughout the State; nor, shall any act, except such as relates to public schools, be passed, to take effect upon the approval of any other authority than the General Assembly, except, as otherwise provided in this constitution."

{¶ 95} A two-part test is applied to assess constitutionality under the Uniformity Clause: "(1) whether the statute is a law of a general or special nature, and (2) whether the statute operates uniformly throughout the state." (Citations omitted.) *Desenco, Inc. v. Akron* (1999), 84 Ohio St.3d 535, 541, 706 N.E.2d 323.

{¶ 96} The first part of the test refers to subject matter, not geographical application. Id. at 542, 706 N.E.2d 323. In deciding whether a given subject matter is general or special, the Ohio Supreme Court has said that a matter is of a general nature "if the subject does or may exist in, and affect the people of, every county, in the state." Id. "On the contrary, if the subject cannot exist in, or affect the people of every county, it is local or special." Id. Based on this standard, which differs from the more complex criteria used to decide whether laws are "general" for purposes of the home-rule amendment, we conclude that the subject matter of R.C. 9.481 is general because the subject of the statute (residency) does or may exist in and affect the people of every county in the state.

{¶ 97} In *Austintown Twp. Bd. of Trustees v. Tracy* (1996), 76 Ohio St.3d 353, 356, 667 N.E.2d 1174, the Ohio Supreme Court stressed that "uniform operation throughout the State" means "universal operation as to territory; it takes in the whole state. And, as to persons and things, it means universal operation as to all persons and things in the same condition or category. When a law is available in every part of the state as to all persons and things in the same condition or category, it is of uniform operation throughout the state."

{¶ 98} Again, under this definition, we conclude that R.C. 9.481 does not violate the Uniformity Clause. Although R.C. 9.481 distinguishes among "full-time" employees, "part-time" employees, and "volunteers," the law is available in every part of Ohio to all individuals occupying the same position or category. In other words, all part-time employees or volunteers in every municipality in Ohio may be subjected to a residency requirement, while full-time employees may live where they choose.

{¶ 99} Dayton contends that these classifications violate the Uniformity Clause because they are arbitrary. However, the Ohio Supreme Court has rejected the idea that arbitrary classifications violate the Uniformity Clause. *Austintown*, 76 Ohio St.3d at 358, 667 N.E.2d 1174. In *Austintown*, the court stressed:

{¶ 100} "[A]rbitrary classifications violate the Uniformity Clause only where those classifications are contained in a statute first deemed to be special or local as opposed to general. * * *

{¶ 101} "Further, acceptance of the contention that the Uniformity Clause bars all legislatively created classifications deemed by the judiciary to be arbitrary would improperly and unnecessarily expand the scope of that constitutional provision. Traditionally, and more appropriately, it is equal protection analysis, rather than Uniformity Clause analysis, which mandates inquiry into whether legislatively created classifications of similarly situated persons bear a rational relationship to legitimate governmental purposes." Id. at 358–359, 667 N.E.2d 1174.

{¶ 102} Based on the Ohio Supreme Court's instruction in *Austintown*, we will not consider whether the classifications in R.C. 9.481 are arbitrary. We also note that Dayton failed to challenge R.C. 9.481 on equal protection grounds.

{¶ 103} In light of the above discussion, we conclude that R.C. 9.481 does not violate the Uniformity Clause. Accordingly, Dayton's fourth assignment of error is overruled.

## VI

{¶ 104} All of Dayton's assignments of error having been overruled, the judgment of the trial court is affirmed.

Judgment affirmed.

DONOVAN, J., concurs.

GRADY, J., dissents.

GRADY, J., dissenting:

{¶ 105} The question presented in this appeal is whether the residency requirement in the charter of the city of Dayton survives the prohibition against such regulations in R.C. 9.481. That question presents two issues of law. The first issue is whether the city's residency requirement is entitled to the protection of the home-rule amendment, Section 3, Article XVIII of the Ohio Constitution. If that protection applies, then the second issue for determination is whether R.C. 9.481 was enacted pursuant to the authority conferred on the General Assembly by Section 34, Article II, which trumps the protections afforded local legislation by the home-rule amendment.

{¶ 106} Section 3, Article XVIII provides:

{¶ 107} "Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws."

{¶ 108} In *Canton v. State* (2002), 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, the Supreme Court held:

{¶ 109} "To constitute a general law for purposes of home-rule analysis, a statute must (1) be part of a statewide and comprehensive legislative enactment, (2) apply to all parts of the state alike and operate uniformly throughout the state, (3) set forth police, sanitary, or similar regulations, rather than purport only to grant or limit legislative power of a municipal corporation to set forth police, sanitary, or similar regulations, and (4) prescribe a rule of conduct upon citizens generally." Id. at syllabus.

{¶ 110} R.C. 9.481 fails the tests for a general law in several ways, but most clearly because it does not "set forth police, sanitary, or similar regulations, (but) purport(s) only to grant or limit legislative power of a municipal corporation to set forth police, sanitary, or similar regulations." By its terms, R.C. 9.481 is wholly and exclusively prohibitory. Therefore, R.C. 9.481 is not a general law for purpose of Section 3, Article XVIII that nullifies the residency requirement in the charter of the city of Dayton.

{¶ 111} Even if R.C. 9.481 were found to satisfy the test for a "general law," it would not prevail over the conflicting provisions of Dayton's residency requirement for its employees, because the city's residency requirement is an exercise of its proprietary authority, which is protected by Section 3, Article XVIII, from the state's exercise of its police power, absent some other prohibition.

{¶ 112} The general laws of the state to which Section 3, Article XVIII refers "are obviously such as relate to police, sanitary, and other similar regulations, and which apply uniformly throughout the State." *Fitzgerald v. Cleveland* (1913), 88 Ohio St. 338, 359, 103 N.E. 512. They are expressions of "that inherent sovereignty which it is the right and duty of the government or its agents to exercise whenever public policy in a broad sense demands, for the benefit of society at large, regulations to guard its morals, safety, health, order, or to insure in any respect such economic conditions as an advancing civilization of a highly complex character requires." *Miami County v. Dayton* (1915), 92 Ohio St. 215, 223–224, 110 N.E. 726.

{¶ 113} Municipalities may likewise exercise the police power. See, e.g., *State ex rel. Tomino v. Brown* (1989), 47 Ohio St.3d 119, 549 N.E.2d 505. However, the grant to municipalities of "all power of local self-government" in Section 3, Article XVIII is broader than the authority to exercise the police power. Therefore, not all local legislation is necessarily an exercise of a municipality's police power. Further, it is only those enactments of "local police, sanitary and similar regulations" that are subject to the superseding provisions of the home rule amendment when they conflict with a general law. *State ex rel. Canada v. Phillips* (1958), 168 Ohio St. 191, 5 O.O.2d 481, 151 N.E.2d 722.

{¶ 114} The police power is a governmental power, the power to prescribe rules regulating the conduct of the public generally in order to provide for the common welfare of the governed. *State v. Martin* (1958), 168 Ohio St. 37, 5 O.O.2d 293, 151 N.E.2d 7. As applied to business activities, it is the power to regulate them as opposed to the power to engage in them. *State v. Helvering* (1934), 292 U.S. 360, 54 S.Ct. 725, 78 L.Ed. 1307. When engaged in a business activity, a municipal corporation acts as a proprietor, not a governmental entity performing a regulatory function.

{¶ 115} Notwithstanding the fact that it is a municipality, and the fact that the city of Dayton's residency requirement regulates who may be its employees, that determination is an exercise of the city of Dayton's proprietary authority, not an exercise of its police powers. The city's exercises of its authority as a proprietor are protected by the home-rule amendment from interference by the General Assembly through an exercise of the state's police powers, except to the extent that the city's exercise of its proprietary authority violates some other constitutional prohibition, such as the Equal Protection Clause, which the General

Assembly may use its police powers to enforce. No such violation is argued. Therefore, regardless of any conflict with R.C. 9.481, that section, being an exercise of the police power, does not supersede the city's residency requirement pursuant to Section 3, Article XVIII, because the residency requirement is an exercise of the city's authority to act for its own proprietary purposes. The action that the city took in adopting its residency requirement for employees is not different in kind and character from deciding from whom it will purchase its supplies, which is plainly a matter protected from state intrusion by the home-rule amendment.

{¶ 116} Even if R.C. 9.481 fails as a general law for purposes of home-rule analysis, it nevertheless prevails over the protections the home-rule amendment provides if the General Assembly passed R.C. 9.481 pursuant to the authority conferred on it by Section 34, Article II. That section states:

{¶ 117} "Laws may be passed fixing and regulating the hours of labor, establishing a minimum wage, and providing for the comfort, health, safety and general welfare of all employees; and no other provisions of the constitution shall impair or limit this power."

{¶ 118} The first thing to understand about Section 34, Article II is that, as a grant of authority to the General Assembly, it is redundant. Section 1, Article II of the Ohio Constitution provides: "The legislative power of the state shall be vested in a General Assembly * * *." That grant of authority was originally provided by Article I, Section 1 of the 1802 Ohio Constitution. *Swisher*, Ohio Constitution Handbook (1990), Editor's Comment, 209. The "legislative power" conferred on the General Assembly includes an inherent power to prescribe regulations that promote the education, health, safety, peace, morals, and general welfare of the community, which is exercised under the rubric "police power." *State v. Stouffer* (1971), 28 Ohio App.2d 229, 57 O.O.2d 342, 276 N.E.2d 651. The General Assembly's exercise of the police power is not plenary, but is subservient to other provisions of the Ohio Constitution. *French v. Dwiggins* (1984), 9 Ohio St.3d 32, 9 OBR 123, 458 N.E.2d 827.

{¶ 119} The police power conferred on the General Assembly by Section 1, Article II is fully sufficient to authorize any legislation comprehended by Section 34, Article II. However, because of apprehensions that other provisions of the Constitution might impair the General Assembly's exercise of its Section 1, Article II powers for that purpose, Section 34, Article II was adopted. Steinglass and Scarselli [3] explain.

---

**3.** Steven H. Steinglass and Gino J. Scarselli, "The Ohio State Constitution, A Reference Guide," Pralger Publishers (2004), 152.

{¶ 120} "The adoption of Article II, section 34 was one of the major achievements of the Progressive movement at the 1912 convention. In 1912 shortly after the Constitutional Convention convened but long before it completed its work, the Ohio Supreme Court in *State, ex rel. Yaple v. Creamer* (1912)[4] upheld the constitutionality of Ohio's first workers' compensation laws. However, the statute was voluntary, and the court suggested that coercive legislation would violate the Ohio Constitution (ibid.; see also *Taylor v. Academy Iron & Metal Co.* 1988: 151).[5] Section 34 insulated a *mandatory* program of workers' compensation from constitutional attack by providing 'a broad grant of authority to the legislature to provide for the welfare of all working persons' (*Rocky River v. State Employment Relations Board,* 1989): 13–14)[6] and by 'empower[ing] the General Assembly to regulate the employment relationship without running afoul of the now-obsolete judicial doctrine of "economic substantive due process" ' (*Brady v. Safety–Kleen Corp.,* 1991: 639).[7]

{¶ 121} "Section 34 accomplished the latter purpose by containing a statement, identical to the one in section 33, that 'no other provision of the constitution shall impair or limit this power.' This provision insulated the program from claims that legislation enacted under its authority violated other provisions of the Ohio Constitution."

{¶ 122} The history and origin of Section 34, Article II are germane to its coverage. An editor's note to the discussion of Section 34, Article II in Baldwin's Ohio Revised Code Annotated states that it was among "[t]he key reforms advocated by organized labor in the late nineteenth and early twentieth centuries (that) included a living wage, decent working conditions, and job security." Those matters concern the working environment. Since its adoption, judicial approval of legislation enacted pursuant to Section 34, Article II has been confined to matters that involve such conditions of employment. See *Rocky River v. State Emp. Relations Bd.* (1989), 43 Ohio St.3d 1, 35, 539 N.E.2d 103 (Holmes, J., dissenting).

{¶ 123} The trial court in the present case departed from that standard, reasoning that the "general welfare of all employees" clause in Section 34, Article II authorized enactment of R.C. 9.481, prohibiting limitations on the place of residence of municipal employees. The trial court erred when it so held, because application of a general provision to facts beyond the range of those in special

---

4. *Yaple v. Creamer* (1912), 85 Ohio St. 349, 97 N.E. 602.

5. *Taylor v. Academy Iron & Metal Co.* (1988), 36 Ohio St.3d 149, 522 N.E.2d 464.

6. *Rocky River v. State Emp. Relations Bd.,* (1989), 43 Ohio St.3d 1, 539 N.E.2d 103.

7. *Brady v. Safety–Kleen Corp.* (1991), 59 Ohio St.3d 705, 571 N.E.2d 132.

provisions to which it is attached lets the tail wag the dog and risks extending a general provision to matters beyond the intention of those who adopted it. Determination of that intention is the goal of the canon of interpretation *nosciture a sociis*: to interpret a general term to be similar to more specific terms in a series. As we apply that principle, and consistent with its reference specifically to laws "establishing a minimum wage, and providing for the comfort, health, (and) safety" of all employees, the "general welfare" clause of Section 34, Article II authorizes only legislation regulating conditions of employment within the working environment.

{¶ 124} R.C. 9.481 goes beyond those limits by prohibiting municipal legislation that places limits on where employees of the municipality may reside. Such regulations apply to conditions *for* employment, not to conditions of employment, which are those that pertain to the working environment. Therefore, R.C. 9.481 was not validly enacted pursuant to Section 34, Article II, and its superseding provision does not trump the protections that the home rule amendment affords to Dayton's residency requirement. Instead, and necessarily, R.C. 9.481 was enacted pursuant to the authority conferred on the General Assembly by Section 1, Article I, and to that extent is subject to Section 3, Article XVIII, the home rule amendment.

{¶ 125} I would hold that the city of Dayton's residency requirement for its employees, not being a "local police, sanitary or similar regulation," is not subject to the superseding provisions applicable to conflicts with general laws in Section 3, Article XVIII and that R.C. 9.481 cannot supersede the Dayton residency requirement because that section, being only prohibitory, is not a general law given preference over local enactments by Section 3, Article XVIII. Further, because R.C. 9.481 exceeds the authority conferred on the General Assembly by Section 34, Article II, the superseding provisions of Section 34, Article II cannot apply to deny the city of Dayton's residency requirement for its employees the protections it is afforded by Section 3, Article XVIII, the home-rule amendment. I would reverse the declaratory judgment that the trial court granted for those reasons and remand the case to the common pleas court to enter a declaratory judgment consistent with those reasons.