**PAXSON, Appellant,**

v.

**The CITY OF DAYTON, Appellee.**

[Cite as *Paxson v. Dayton,* 183 Ohio App.3d 89, 2009-Ohio-3306.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 22888.

Decided June 30, 2009.

Brannon & Associates, Dwight D. Brannon, and Matthew C. Schultz, for appellant.

Green & Green and Thomas M. Green, for appellee.

BROGAN, Judge.

{¶ 1} Mark S. Paxson appeals from the trial court's final order affirming a decision of the Dayton Civil Service Board, which upheld the termination of his employment for violating a city residence requirement.

{¶ 2} Paxson advances three assignments of error on appeal. First, he contends that the trial court erred in not holding that R.C. 9.481 prohibited his discharge for violating the residence requirement. Second, he claims that the trial court erred in not declaring the city's residence requirement unconstitution-

al, as applied, for infringing on his fundamental right to raise his daughter. Third, he asserts that the trial court erred in not finding that he was an actual resident of, and physically lived in, the city of Dayton.

{¶ 3} The record reflects that Paxson was employed by the city as a community-development analyst. In 2005, the city received an anonymous tip that he was not residing within the city limits, as required by the Dayton City Charter. As a result, the city hired a private company, Cal Crim, to conduct surveillance and to investigate his residence. At that time, Paxson maintained an efficiency apartment on Brown Street in Dayton. Based on the results of the Cal Crim investigation, however, the city believed that Paxson actually was residing in Springfield Township in Clark County with his teenaged daughter and her mother, Charlene Yoakum. On August 29, 2005, the city charged Paxson with violating its residence requirement. Following a departmental hearing, supervisor William Saluke found him guilty. A discharge order was entered terminating Paxson's employment effective September 23, 2005.

{¶ 4} Paxson appealed his discharge to the Dayton Civil Service Board, which held its own hearing on May 9, 2006. The board upheld his termination on June 8, 2006. Paxson then filed an administrative appeal in Montgomery County Common Pleas Court under R.C. Chapter 2506. On July 18, 2008, the trial court affirmed the board's decision. This timely appeal followed.

{¶ 5} In his first assignment of error, Paxson contends that the trial court erred in not finding that his discharge was prohibited by R.C. 9.481, which provides that "no political subdivision shall require any of its employees, as a condition of employment, to reside in any specific area of the state."

{¶ 6} The trial court held that R.C. 9.481 had no applicability, because it applied only prospectively and did not take effect until May 1, 2006, well after the September 23, 2005 effective date of Paxson's termination. Paxson argues, however, that the relevant date was not September 23, 2005. Instead, he claims the relevant date was June 8, 2006, when the Dayton Civil Service Board affirmed his dismissal. Because R.C. 9.481 took effect before the board's decision, he contends, the statute prohibited his termination.

{¶ 7} Upon review, we find Paxson's argument to be unpersuasive. The city manager terminated Paxson's employment effective September 23, 2005, after supervisor William Saluke found him guilty of violating the residence requirement. Section 48 of the Dayton City Charter vests the city manager with authority to remove an employee. Section 101 of the charter provides that any employee in the classified service who is dismissed by the city manager may appeal that decision to the civil service board. Dayton Civil Service Rule 14 grants an employee in the classified service ten days from the effective date of his

dismissal to appeal to the civil service board. Under Rule 14, the board's decision on the matter is a final order that may be appealed further as provided by law.

{¶ 8} Although Paxson's discharge was subject to review by the civil service board and later subject to an administrative appeal in the trial court, the fact remains that his employment was terminated effective September 23, 2005. On that date, an authorized representative of the city of Dayton discharged him for violating the residence requirement. Nothing in the record suggests that Paxson's dismissal was stayed pending appeal, and he makes no such argument. Because R.C. 9.481 was not made retroactive and did not take effect until May 1, 2006, we agree with the trial court's determination that the statute had no applicability to Paxson's termination.[1]

{¶ 9} In opposition to the foregoing conclusion, Paxson stresses that the Dayton Civil Service Board is part of the city of Dayton, which is a political subdivision. Therefore, he reasons that the board is itself a political subdivision and that the board violated R.C. 9.481, which was in effect when it terminated him for not residing in the city limits. The problem with this argument is that the civil service board did not terminate Paxson's employment. Rather, the Dayton city manager terminated his employment effective September 23, 2005. The board merely upheld this decision.

{¶ 10} In essence, the city of Dayton, acting through its city manager, terminated Paxson's employment before the effective date of R.C. 9.481. The city of Dayton, acting through its civil service board, then rejected his appeal and reaffirmed its earlier decision after the statute's effective date. Under these circumstances, we find no merit in Paxson's argument that the city discharged him in contravention of R.C. 9.481. The trial court properly held that the statute had no effect because he was dismissed before its effective date.

{¶ 11} Paxson's citation of *Mealing v. Ridgefield*, Washington (W.D.Wash., Mar. 19, 2007), W.D.Wash. No. C05–5578FDB, fails to persuade us otherwise. *Mealing* bears no similarity to the case before us. It involved a race-discrimination claim brought under Section 1983, Title 42, U.S.Code. The Ridgefield city manager and police chief discharged Carl Mealing from his position as a police officer after receiving harassment complaints. Mealing appealed to the civil service board, which placed him on paid administrative leave with full retroactive pay from the date of his termination. Mealing subsequently withdrew his appeal,

---

1. Although the Ohio Supreme Court recently upheld the constitutionality of R.C. 9.481 in *Lima v. Ohio*, 122 Ohio St.3d 155, 2009-Ohio-2597, 909 N.E.2d 616, this ruling is of no help to Paxson. Despite its constitutionality, the statute does not apply to him, because it was not made retroactive and he was terminated prior to its effective date.

and his salary and benefits stopped. He separately filed a lawsuit under Section 1983, seeking to hold the city of Ridgefield liable for race discrimination. Citing *Monell v. Dept. of Social Servs.* (1978), 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611, the trial court noted that liability would not attach to the city under respondeat superior. Instead, Mealing was required to show that someone with final policymaking authority had committed a constitutional tort against him. Even though the city manager and police chief had fired Mealing, the trial court noted that the civil service commission was the official policymaker for the city. The trial court also observed that the civil service commission had taken steps to prevent and rectify any unlawful discrimination. Finally, the trial court noted Mealing's failure to "demonstrate that an official with 'final policy-making authority' [had] terminated [him] and that the action was an act of official government policy."

{¶ 12} Having examined *Mealing*, we see nothing that would assist Paxson or undermine our conclusion herein. We do not dispute his assertion that the city manager's authority to fire him was subject to Dayton's civil service rules and to review by the Dayton Civil Service Board. The fact remains, however, that the city of Dayton, acting through its authorized representative, the city manager, terminated Paxson's employment effective September 23, 2005. Although the city of Dayton, acting through its civil service board, later reviewed and upheld this decision, Paxson indisputably was terminated on September 23, 2005. Nothing in the Dayton City Charter, the Dayton Civil Service Rules, or the Revised Code persuades us that he remained a municipal employee pending the civil service board's review of his appeal. The first assignment of error is overruled.

{¶ 13} In his second assignment of error, Paxson contends that the trial court erred in not declaring the residence requirement unconstitutional as applied, for infringing on his fundamental right to raise his daughter.

{¶ 14} Paxson asserts that he primarily spent time in Springfield to raise his daughter, to visit with her, and to provide overnight care when her mother, Charlene Yoakum, a surgical nurse at a local hospital, had to respond to emergency calls. Paxson professes not to dispute that a city may impose a residence requirement, at least prior to the enactment of R.C. 9.481, and that there is no constitutional right to municipal employment while residing elsewhere. At the same time, however, he maintains that Dayton's interpretation and application of its residence rule infringed on his constitutional right to care for his daughter and to raise her as he sees fit. In connection with this argument, Paxson contends that a city policy that five or more observed overnight absences from the city violates the residence requirement is itself a violation of his constitutional right to make decisions regarding his daughter. Paxson urges us to adopt a construction of Dayton's residence rule that would permit apparently

unlimited overnight absences from the city, provided they "are necessitated by the [employee's] exercise of a fundamental right" to raise his child. He insists that any such absences lawfully "cannot be counted against the employee."

{¶ 15} Upon review, we find Paxson's second assignment of error to be without merit. As the trial court recognized, "[t]here is no constitutional right to be employed by a municipality while living elsewhere." *Buckley v. Cincinnati* (1980), 63 Ohio St.2d 42, 44, 17 O.O.3d 26, 406 N.E.2d 1106, citing *McCarthy v. Philadelphia Civ. Serv. Comm.* (1976), 424 U.S. 645, 96 S.Ct. 1154, 47 L.Ed.2d 366. As the trial court also recognized, the city's residence requirement "neither directly nor indirectly commandeer[ed] his right to make decisions concerning his daughter's welfare and happiness." All the residence requirement did was prohibit Paxson from residing with his daughter in Springfield while being employed by the city of Dayton. Under Section 102 of the Dayton City Charter, Paxson was required to be an actual resident of, and physically live in, the city. The extent of his activity in Springfield either violated this requirement or it did not, regardless of why he was there.[2]

{¶ 16} If Paxson's proposed interpretation of the residence requirement were accepted, any municipal employee could have his children live outside of Dayton and then spend all of his free time there with them on the theory that he merely was exercising his constitutional right to raise them. Adopting such an interpretation of the city's residence requirement would obliterate it.

{¶ 17} Finally, we find no merit in Paxson's argument that the city violated his constitutional rights by adopting a policy that five or more observed overnight absences from Dayton violates its residence requirement. Human resources supervisor Brent McKenzie testified that he was responsible for investigating and prosecuting residency violations. He explained that he "look[s] for at least five overnights demonstrating a violation of the residency rule" before pursuing a charge. Once a charge was filed against Paxson, however, at least two separate hearings were held to determine whether the specific standard set forth in Dayton City Charter Section 102 had been violated. This determination was made by hearing officers based on all the evidence presented, which included, among other things, Paxson's explanation for his overnight stays in Springfield and evidence concerning his whereabouts in the evenings after work. Contrary to the implication of his argument, the city did not simply discharge him once he was found to have spent five or more nights outside the city limits. His second assignment of error is overruled.

---

2. We will address this issue in our analysis of Paxson's third assignment of error.

{¶ 18} In his third assignment of error, Paxson contends that the trial court erred in not finding that he was an actual resident of, and physically lived in, the city of Dayton. He advances two related arguments. First, he claims that the trial court committed an error of law by relying on the city's "five overnight absences" rule and failing to follow prior case law from this court. Second, he asserts that the trial court abused its discretion by ignoring the evidence, which he contends overwhelmingly established that he resided in the city.

{¶ 19} Having reviewed the record and applicable law, we are unpersuaded by either argument. The present appeal arises under R.C. 2506.01, et seq., which provides for an appeal to the common pleas court from the final order of an administrative body such as the Dayton Civil Service Board and, thereafter, for an appeal to this court from the common pleas court. The scope of judicial review of an administrative order is set forth in R.C. 2506.04, which states:

{¶ 20} "The court may find that the order, adjudication, or decision is unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable, and probative evidence on the whole record. Consistent with its findings, the court may affirm, reverse, vacate, or modify the order, adjudication, or decision, or remand the cause to the officer or body appealed from with instructions to enter an order, adjudication, or decision consistent with the findings or opinion of the court. The judgment of the court may be appealed by any party on questions of law as provided by the Rules of Appellate Procedure and, to the extent not in conflict with those rules, Chapter 2505 of the Revised Code."

{¶ 21} In *Smith v. Granville Twp. Bd. of Trustees* (1998), 81 Ohio St.3d 608, 693 N.E.2d 219, the Ohio Supreme Court reiterated the standards of review that common pleas courts and appellate courts should apply when reviewing administrative orders. In particular, the *Smith* court noted that a common pleas court "must weigh the evidence in the record" to determine whether an agency's order is unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable, and probative evidence. Id. at 612, 693 N.E.2d 219. " 'An appeal to the court of appeals, pursuant to R.C. 2506.04, is more limited in scope and requires the court to affirm the common pleas court, unless the court of appeals finds, as a matter of law, that the decision of the common pleas court is not supported by a preponderance of reliable, probative and substantial evidence.' " Id. at 613, 693 N.E.2d 219, quoting *Kisil v. Sandusky* (1984), 12 Ohio St.3d 30, 34, 12 OBR 26, 465 N.E.2d 848.

{¶ 22} In the present case, the trial court upheld the civil service board's finding that Paxson had violated Dayton's residence requirement. The trial court reasoned:

{¶ 23} "In this case, there is sufficient evidence to the Board to affirm Paxson's termination. On one hand, Paxson rented an apartment on Brown Street in Dayton, equipped with electricity, cable, clothing, and his furnishings. Paxson would return on weekends and paid his rent in person. His bills, automotive registration, and voter registration listed the Brown Street apartment as his address. Paxson testified that he did not have keys to the Springfield residence. Paxson belongs to social organizations in Dayton but not in Springfield. Paxson does not have any formal ownership interest in Yoakum's house.

{¶ 24} "On the other hand, Paxson, in a very short period of time, spent the vast majority of his nights in Springfield. Paxson maintains some clothes in the Springfield residence and showers there. Paxson performs routine maintenance on the house, including mowing the grass. Paxson attends most of his daughter's extracurricular activities, all of which occur in Springfield after work. When his daughter's cat was sick, Paxson took the cat to two different veterinary clinics in Springfield. Paxson helped Yoakum and their daughter look at houses for sale. Paxson's daughter testified that Paxson sleeps in Yoakum's bedroom and Paxson referred to Yoakum as his wife. Paxson listed Yoakum's Springfield address as his address in an Area Two Montgomery County Court case from 2001, while he was working as a City employee.

{¶ 25} "There is sufficient evidence in the record to support the Board's decision affirming Paxson's termination. The Court acknowledges that substantial evidence exists on both sides of this case. Likely, the credibility of such evidence would have weighed heavily on [the] Board's resolution of this matter. The Board, rather than this Court, is in the best position to resolve such issues. Moreover, this Court may not substitute its judgment for the Board's where sufficient evidence exists to support the Board's decision. The Board's decision was based on numerous factors that the Board could reasonably conclude demonstrated that Paxson resided in Springfield. Therefore, as the board's decision was based on sufficient evidence, Paxson's assignments of error related to the evidentiary basis for the decision are overruled."

{¶ 26} Upon review, we find no error in the trial court's conclusion. Contrary to Paxson's argument on appeal, the trial court did not simply adopt the city's "five-overnight-absences rule" and uphold his discharge without applying any case law from this court. To the contrary, immediately before engaging in the analysis set forth above, the trial court recited the governing standards set forth in *Dayton v. Hewitt,* 153 Ohio App.3d 695, 2003-Ohio-4324, 795 N.E.2d 713, ¶ 7, and *Harmon v. Dayton* (July 20, 2001), Montgomery App. No. 18725, 2001 WL 817813 (*"Harmon III"*). The trial court then proceeded to address and consider various pieces of evidence from the hearing, not just the fact that Paxson was observed spending more than five nights in Springfield.

{¶ 27} As for Paxson's argument that the evidence "overwhelmingly indicated his city residence," we disagree. Dayton's residence rule obligates employees to "be actual residents of and physically live in" the city. In *Harmon III*, we recognized that the rule "requires much more from an employee than simply renting an apartment in the city while regularly living elsewhere." In particular, it "requires a city employee to spend significant parts of each day at the location for purposes consistent with residence." Similarly, in *Harmon v. Dayton* (July 26, 1996), Montgomery App. No. 15555, 1996 WL 417101 ("*Harmon II*"), we interpreted the residency rule as requiring "being physically present and living at a particular location as a householder or member of a household for significant parts of each day for important purposes consistent with residence." Relevant considerations include, among other things, "where a person eats, where he sleeps, where his family eats and sleeps, where he bathes, where he has telephone service, where he receives mail, or other similar activities." Id.

{¶ 28} We subsequently applied our *Harmon* decisions in *In re Wickline*, Montgomery App. No. 19228, 2002-Ohio-4976, 2002 WL 31105396. There we considered the case of Richard Wickline, a Dayton firefighter who frequently slept outside the city at a home where his wife and teenaged children lived. Wickline maintained his own residence in the city. He normally went to his own city residence after completing a 24–hour shift at the fire station. He often showered there, ate there, changed clothes there, performed personal work there, and "putzed around the house" before heading to the out-of-town residence occupied by his wife and children. We found it important, but not dispositive, that Wickline frequently spent the night outside the city when he was not working a 24–hour shift. Noting the existence of substantial evidence that he also spent large parts of his days at his city residence, we upheld a finding that Wickline's primary place of abode was within the city.

{¶ 29} Finally, in *Hewitt*, 153 Ohio App.3d 695, 2003-Ohio-4324, 795 N.E.2d 713, we considered the case of Timothy Hewitt, another city employee whose wife and daughter lived out of town. Hewitt claimed to reside in the city with a friend, but his family lived on a farm outside of Dayton. Hewitt spent nearly all his free time at the farm and stayed overnight there at least twice a week. The evidence revealed that he spent little time at his city residence and rarely did more than sleep there. Although Hewitt received mail at his city residence, kept clothes there, and spent some time there, we concluded that he lacked the kind of connection with the city residence that the residency rule required.

{¶ 30} Guided by the foregoing decisions, we believe the trial court's ruling in the present case is supported by the evidence. The record reflects that Paxson maintained a studio apartment on Brown Street in Dayton. He paid for telephone service, utilities, and cable television there. He also furnished the

apartment and had personal belongings there. Paxson used the Brown Street address for his voter registration, car registration, and driver's license. He paid his rent in person across the street. He also claimed to shower at Brown Street and eat lunch there several times a week.

{¶ 31} On the other hand, the city's investigation revealed that Paxson spent most of the observed nights in Springfield. On Monday, June 20, 2005, surveillance showed Paxson's car parked outside the Springfield residence at 5:00 a.m. Charlene Yoakum left the house in her own car at 5:45 a.m. At 7:00 a.m., investigators saw Paxson standing on the front porch in a bathrobe. He left at 7:19 a.m. and went directly to work at the Dayton City Hall.

{¶ 32} Likewise, on Tuesday, June 21, 2005, investigators again arrived at the Springfield residence and saw Paxson's car parked there at 5:18 a.m. Yoakum's vehicle also was present. At approximately 7:30 a.m., Paxson left the house and drove to work. He went directly back to the Springfield residence after work that afternoon. He remained there at 8:30 p.m., when surveillance was discontinued for the day.

{¶ 33} Surveillance next occurred on the afternoon of Tuesday, July 5, 2005. Investigators followed Paxson from work that afternoon to the Springfield residence, where he arrived at approximately 6:30 p.m. Paxson remained there until the next morning, Wednesday, July 6, 2005, when he was observed proceeding directly to work. After Paxson finished working that day, investigators again followed him to Springfield, where he watched his daughter's softball game before taking her to the Springfield residence. Paxson remained there all night. He left the following morning, Thursday, July 7, 2005, and went directly to work. After he finished working that day, Paxson remained in the Dayton area and spent the night at his Brown Street apartment. Investigators observed him leaving there for work on the morning of July 8, 2005.

{¶ 34} Surveillance next took place on the afternoon of Monday, August 1, 2005. After leaving work that day, Paxson stopped at a fitness center before proceeding to the Springfield residence. He remained there overnight. On the morning of Tuesday, August 2, 2005, investigators watched Paxson leave the Springfield residence and proceed directly to work. He left work around 5:30 that afternoon and returned to the Springfield residence, where he remained until the following morning, Wednesday, August 3, 2005. He left the residence at approximately 7:15 that morning and drove straight to work.

{¶ 35} Surveillance next occurred on the afternoon of Wednesday, August 17, 2005. After leaving work that day, Paxson stopped briefly at Greenon High School in Enon before proceeding to the Springfield residence. He later left for a trip to McDonald's but returned to the Springfield home and spent the night. Investigators watched him leave around 7:00 a.m. on Thursday, August 18, 2005,

and proceed directly to work. After completing work that day, Paxson remained in Dayton and spent the night at his Brown Street apartment. He remained there at 8:30 a.m. on Friday, August 19, 2005, when the surveillance concluded.

{¶ 36} Surveillance next took place on the afternoon of Monday, August 22, 2005. After leaving work that day, Paxson went to a fitness center before traveling to the Springfield residence. He arrived there at 8:49 p.m. and stayed all night. He left before 7:00 a.m. on Tuesday, August 23, 2005, to take his daughter's cat to the veterinarian. He then returned to the Springfield home around 7:40 a.m. Yoakum was seen arriving there at 7:48 a.m. She then departed at 9:12 a.m. Paxson left at 9:45 a.m. and stopped at a bank before proceeding to work. After leaving work that afternoon, Paxson returned to the Springfield residence. Later that evening, he was observed looking at houses for sale with his daughter, Yoakum, and another female. After stopping at a Subway restaurant, he then returned to the Springfield residence and spent the night. He left on the morning of Wednesday, August 24, 2005, and took his daughter to school. He then proceeded to his Brown Street apartment, where he stayed for eight minutes before driving to work.

{¶ 37} At the hearing before the civil service board, human resources employee Brent McKenzie testified that Paxson initially denied ever spending the night at the Springfield residence. According to McKenzie, Paxson also said Yoakum did not like him, and he did not have a place to sleep in Springfield. Paxson also made numerous references to Yoakum as his wife and admitted showering and keeping clothes in Springfield. McKenzie testified that Paxson additionally admitted spending five or six days a week in Springfield to see his daughter, but denied staying overnight.

{¶ 38} In his own testimony before the civil service board, Paxson admitted that he went to Springfield to see his daughter four to six days a week. He insisted, however, that he stayed overnight at the Springfield residence only when Yoakum, a surgical nurse, was called to the hospital for an emergency. According to Paxson, he was not permitted to stay overnight otherwise. Paxson also testified that he generally slept on a couch when he did spend the night in Springfield. Paxson testified that on six of the seven nights that investigators conducted overnight surveillance, Yoakum was on call and had to respond to an emergency call from the hospital. He explained that he stayed the seventh night to comfort his daughter after her cat died.

{¶ 39} For her part, Yoakum testified that Paxson was permitted to spend the night at her house, even when she was not on call for work, if he was tired or if his daughter wanted him to stay. She added that he sometimes stayed seven nights a week. She estimated that he spent the night, on average, two or three nights a week and that he spent time in Springfield with his daughter anywhere

from three to seven nights a week. Conflicting her earlier testimony, Yoakum later asserted that Paxson never spent the night at her Springfield residence when she was not called out to the hospital for an emergency. Contrary to Paxson's testimony, she also acknowledged that he usually slept in her bed when he did spend the night. Paxson's daughter confirmed this fact. Yoakum further claimed that when she would return home from a late night hospital emergency call, Paxson generally would leave in the middle of the night and go back to his Brown Street apartment.

{¶ 40} During the civil service board hearing, Paxson attempted to introduce into evidence correspondence from Mercy Medical Center employee Ralph Wilson. According to Paxson, the correspondence corroborated his claim that Yoakum was called to the hospital for an emergency each night that the city's investigators observed him staying all night in Springfield. The civil service board refused to admit this documentation into evidence, finding that it constituted hearsay. Paxson has not challenged this ruling on appeal. In any event, we note that the documentation does not entirely corroborate Paxson's claim. It reflects that Yoakum's "on-call team" was called to work at least once on the following dates: July 5 and 6, 2005, and August 1, 2, 6, 14, 17, 22, 26, and 27, 2005. The documentation does not reflect what time she was called or what time she returned home. Presumably, emergency calls would have occurred at different times and would have been of varying durations. On each of the nights he stayed in Springfield, however, Paxson's schedule was more regular. He went there immediately after finishing his work day and stayed throughout the night. Paxson's documentation also does not account for Monday, June 20, 2005. As noted above, surveillance showed his car parked outside the Springfield residence at 5:00 a.m. Yoakum left in her own car at 5:45 a.m. At 7:00 a.m., investigators observed Paxson on the porch wearing a bathrobe. He left at 7:19 a.m. and went to work. The documentation also does not account for the following day, Tuesday, June 21, 2005, when investigators again arrived at the Springfield residence and saw Paxson's car parked there at 5:18 a.m. with Yoakum's vehicle also present. Although all-night surveillance was not conducted on these occasions, it is reasonable to infer that he had spent the night, given his presence before 6:00 a.m. We note too that the documentation does not account for Paxson's spending the night in Springfield on Tuesday, August 23, 2005. Although his daughter's cat had died early that morning, the trial court was not required to accept his explanation that he spent the night solely to comfort her. His daughter was not too distraught to go house hunting that same evening, and, in any event, it is questionable whether Paxson's act of spending the night, apparently in Yoakum's bed, would have consoled her. In evaluating his credibility, the trial court also was entitled to take into consideration Paxson's initial denial during the departmental hearing that he ever spent the night at the

Springfield residence. The trial court likewise was entitled to consider Paxson's claim that he slept on Yoakum's couch and the conflicting testimony from Yoakum that he generally slept in her bed. Although this issue is not particularly important as a substantive matter, it does reflect on Paxson's credibility.

■ {¶ 41} Finally, as we noted in *Wickline*, evidence about where Paxson spent the night is certainly important, but not dispositive. It is also important where he spent his nonworking, waking hours. As in *Hewitt*, the record contains substantial evidence that Paxson spent most of his free time in Springfield, either at Yoakum's house or elsewhere with his daughter. Indeed, Paxson admitted spending four to six days a week there, and Yoakum estimated that he saw his daughter in Springfield three to seven times a week. The city's investigation showed him traveling directly to Springfield almost every evening after work. Although the issue is perhaps a close one, we cannot say, as a matter of law, that the trial court's decision regarding Paxson's place of residence is unsupported by a preponderance of reliable, probative, and substantial evidence. While Paxson's appellate brief identifies several relatively minor perceived errors in the civil service board's findings,[3] we remain convinced, based on a review of the entire record, that the trial court's conclusion is supported by a preponderance of the evidence. Paxson's third assignment of error is overruled.

{¶ 42} The judgment of the Montgomery County Common Pleas Court is affirmed.

*Judgment affirmed.*

FAIN, J., concurs.

GRADY, J., dissents.

GRADY, Judge, dissenting.

{¶ 43} Plaintiff-appellant Paxson commenced the underlying action in the court of common pleas pursuant to R.C. 2506.01. That section authorizes a review by

---

**3.** For example, Paxson notes that the civil service board mistakenly recited his address as 1118 Brown Street rather than 1122 Brown Street. He also takes issue with the use of the term "random" to describe the dates selected for surveillance. In addition, he criticizes the civil service board for stating that he spent 11 nights in Springfield and two in Dayton. Paxson contends he spent only seven nights in Springfield. We note, however, that the civil service board appears to have counted as overnight stays the two occasions when Paxson was observed at Yoakum's house before 6:00 a.m. As set forth above, we find it reasonable to infer that Paxson had spent the night on those occasions. Paxson also disputes a finding that he was seen cutting the grass at Yoakum's residence. Based on our review of the record, we agree that this grass-cutting incident is irrelevant as it took place after his termination. Finally, Paxson contends that the trial court improperly referred to a Montgomery County Area Two Court case that identified his address as being in Springfield. But the existence of this court case is a matter of public record.

the court of common pleas of a "final order, adjudication, or decision" of any "authority, board * * * or other division of any political subdivision of the state." Id. In performing its review, the common pleas court is charged to determine whether the order, adjudication, or decision is "illegal," R.C. 2506.04, and to reverse or vacate the order, adjudication, or decision upon a finding that it is illegal. Id.

{¶ 44} The city of Dayton is a political subdivision of the state. Section 10, Article XV of the Ohio Constitution requires cities to appoint and promote in the civil service according to merit and fitness. In furtherance of that policy, R.C. 705.23 requires cities such as Dayton to appoint a three-member civil service commission. Section 93 of the Charter of the city of Dayton provides that its legislative body, the city Commission, shall appoint three electors of the city to serve as a civil service board, and that its members may be removed by the city commission after notice and a hearing. The salaries of members of the civil service board are determined by the city commission. R.C. 703.24.

{¶ 45} Section 101 of the charter of the city of Dayton states:

{¶ 46} "Any employee of any department in the city in the classified service who is suspended, reduced in rank, or dismissed from a department by the director of that department or the City Manager, may appeal from the decision of such officer to the Civil Service Board, and such Board shall define the manner, time, and place by which such appeal shall be heard. The judgment of such Board shall be final."

{¶ 47} Paxson's R.C. 2506.01 appeal to the court of common pleas was not from his termination by his supervisor on September 23, 2005. Indeed, his termination was not reviewable pursuant to R.C. 2506.01. Rather, Paxson's appeal was from the final judgment of the Dayton Civil Service Board on June 8, 2006, that rejected Paxson's challenge to his termination.

{¶ 48} R.C. 9.481(B)(1) prohibits political subdivisions from imposing a residency requirement for their employees.[4] The city of Dayton's residency requirement for its employees in Section 102 of the Charter of the city of Dayton is thereafter void and unenforceable pursuant to R.C. 9.481(B)(1). *Dayton v. State*, 176 Ohio App.3d 469, 2008-Ohio-2589, 892 N.E.2d 506; *Lima v. State*, 122 Ohio St.3d 155, 2009-Ohio-2597, 909 N.E.2d 616.

{¶ 49} Because it is an "authority, board or * * * other division" of the city of Dayton for purposes of R.C. 2506.01, the civil service board is subject to the prohibitions imposed by R.C. 9.481(B)(1) in the decisions it makes pursuant to the authority conferred on it by the city charter. Therefore, the judgment of the civil

---

4. R.C. 9.481(B)(1) became effective on June 8, 2006.

service board on June 8, 2006, after R.C. 9.481(B)(1) became effective, affirming Paxson's termination for his violation of the city of Dayton's residency requirement, is "illegal" for purposes of R.C. 2506.01. The court of common pleas erred when it failed to so find, and on that finding to reverse the order of the civil service board pursuant to R.C. 2506.04.